**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Larry Allen MYERS,**
**Defendant-Appellant.**

No. 77–5458
**Summary Calendar.***

United States Court of Appeals,
Fifth Circuit.

May 4, 1978.

Richard A. Lazzara, Tampa, Fla. (Court-appointed), for defendant-appellant.

John L. Briggs, U. S. Atty., Jacksonville, Fla., for plaintiff-appellee.

Before RONEY, GEE and FAY, Circuit Judges.

PER CURIAM:

Larry Allen Myers was convicted by a jury of robbing a savings and loan institu-

* Rule 18, 5 Cir.; see *Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al.*, 5 Cir., 1970, 431 F.2d 409, Part I.

tion in violation of 18 U.S.C. § 2113(a) and (d), and he appeals. He contends that the trial court erred in allowing the government to call a certain rebuttal witness and in denying his motions for acquittal based on insufficiency of the evidence. Finding no error in the rulings complained of, we affirm.

Appellant Myers' first trial ended in a mistrial when the jurors were unable to agree. He was convicted upon his second trial, but we reversed the conviction and remanded the case for a new trial. *United States v. Myers,* 550 F.2d 1036 (5th Cir. 1977). That appeal involved different issues than are presented at this time. Since sufficiency of the evidence is questioned, we state the facts in some detail.

### The Facts

On June 13, 1974, at about 2:00 p.m., Patti Britts and Patricia Bush were working at a branch of the First Federal Savings and Loan Association of Largo ("the bank"), located in Clearwater, Florida. The bank was located in a temporary trailer on the outskirts of Clearwater on a major highway. Alone in the bank, the two women observed an old green automobile back into the bank's parking lot. They saw a young man leave the car, pull a stocking over his head, and enter the bank with a revolver in his hand. Ms. Britts activated a silent alarm, which was supposed to set off an alarm in the police station but did not. It did, however, activate a camera in the bank, which filmed the robbery. Seventy-two sequence pictures showing the robbery were admitted into evidence without objection.

Both bank employees described the robber as slight of build, with a large, pointed nose and a heavy moustache. Neither of them was asked whether she could identify appellant as the robber. Both denied seeing anything unusual about the bandit's arms (he wore a short-sleeved shirt). This was corroborated by the photographs.

The robber was carrying both the gun and a paper sack when he entered the bank. He ordered Ms. Britts to put money into the sack, which she did, adding a tear-gas bomb which she did not activate for fear the robber would not leave the bank before it exploded. After obtaining the money, about $1,500, the robber ordered the women to lie on the floor as he departed. The government later adduced evidence that Dennis Lynn Coffie, who earlier had been jointly indicted for this offense and pled guilty, had, at the time of the robbery, tattoos on both of his arms.

Upon leaving the bank the robber drove down the highway to a Ramada Inn about a half mile from the bank. Mrs. Barbara Griffith, an employee of the Inn, testified that she saw the old green car come in from a back road and park near Room 162. In a few minutes a second car, white over blue, drove up and parked behind the first car. Mrs. Griffith testified that there was only one person in each car, but she could not further identify either.

Special Agent Michael Lunsford of the FBI examined a 1960 green Chevrolet at the Ramada Inn shortly after the robbery occurred; thereafter he examined a blue and white Monte Carlo at a shopping center in New Port Richey, Florida. Agent Lunsford stated that a driver's side window of the Monte Carlo was broken out. The agent also found two packages which had contained vinyl gloves in the abandoned Monte Carlo.

Janice Johns Olson testified that she was Dennis Coffie's girlfriend at the time of the robbery. She stated the Coffie had a blue (or green) and white Monte Carlo, of which the driver's side window was broken. Mrs. Olson said that several days before the robbery she, Coffie, and appellant Myers drove in the Monte Carlo to the Clearwater bank, at which time Myers went into the bank to get change and to see what the bank's interior was like. She testified that she later heard Myers and Coffie discuss robbing this bank and stealing a car for use as a getaway car. About two days later the two men told Mrs. Olson that they had stolen a car. The bank was robbed the next day.

■ On the evening of the day of the robbery, Myers picked up Mrs. Olson in the Monte Carlo. They then picked up Coffie at a grocery store and drove to a limestone pit. There they counted the money, which Myers had hidden under the car seat. At that time, Mrs. Olson saw a small device, about which they speculated as to whether it contained dye or tear gas. Myers told Mrs. Olson that during the robbery two ladies were in the bank: one old and one young. The younger lady was frightened, and Myers said he tried to calm her. Mrs. Olson testified that at the time of the robbery Coffie was heavy set and muscular and had tattoos on both arms. From the foregoing, it will be clear that the evidence was ample to support Myers' conviction, and we need discuss this point no further.

On the afternoon before the final day of testimony, the court questioned Coffie as to whether he intended to testify for the defense, as he had done previously. The government was allowed to advise Coffie that if he were to testify truthfully he would not be charged with perjury relative to his prior testimony. Coffie stated that he did not wish to testify, that he claimed his fifth amendment privilege. The court then found that Coffie was "unavailable" as a witness and allowed the defense to read Coffie's previous testimony to the jury. Therein Coffie testified that he alone had robbed the bank and that Myers had nothing to do with it. He further stated that his tattoos did not show because he had used cosmetics on his arms and that he had parked the Monte Carlo at the Ramada Inn and walked to where he stole the getaway car. Thereafter the defense rested.

During the trial Coffie was in the marshal's lockup waiting to be called by the government in rebuttal, to display his tattooed arms and his physique to the jury. On the last day of testimony Coffie sent a note to FBI Agent Calley, saying he wanted to see the agent. Coffie then told Agent Calley that he wished to speak with the United States Attorney. During the noon recess the United States Attorney spoke with Coffie, offering him immunity from any perjury charge arising from testimony

he had given previously if he would testify truthfully at this trial. The United States Attorney also indicated to Coffie that he would be transferred to a different prison and that the fact of his recantation would be made known to the Parole Board. At the end of their discussion Coffie said he did not know if he would testify; and the United States Attorney told Coffie he would send someone to check with Coffie at 1:30 p.m. When court convened at 1:00, Coffie's previous testimony was read to the jury, as the United States Attorney had told Coffie it would be. At 1:30, Coffie sent word to the United States Attorney that he wished to testify. These later developments were made known to the court, which then overruled defense motions to prohibit Coffie from testifying and for a mistrial.

Coffie testified that the testimony he had given in appellant's two earlier trials was untrue. Specifically, he denied that he had robbed the bank. Coffie stated in detail the promises which the government made to him. The court then instructed the jury that he was taking judicial notice that in 1974 an indictment was returned charging appellant and Coffie with having robbed the bank on June 13, 1974, and that Coffie pled guilty to the offense pursuant to Rule 20, Fed.R.Crim.P. Coffie testified further that his previous testimony concerning his route of departure from the bank and his solo use of the automobiles was untrue. The government rested, and the evidence was closed.

### Allowing Coffie to Testify

■ Myers contends that the trial court erred in allowing Coffie to testify. He charges that the government knew, before the reading of Coffie's former testimony, that Coffie would change his position and decide to testify.

The record refutes this suggestion. Coffie's testimony was that he advised the United States Attorney at the noon recess that he had not decided whether to testify. The United States Attorney gave Coffie

until 1:30 to decide; and at 1:30 Coffie sent word that he had decided to testify. Nothing in the record indicates that Coffie could not have sent word before 1:30, if he had decided by that time. Coffie testified that he knew that his previous testimony would be read to the jury at 1:00. Perhaps he delayed until 1:30 so that he would not have to give direct testimony of appellant's guilt but could merely disavow his own earlier testimony. We cannot know, but whatever Coffie's subjective intentions or motivations may have been, he remained unavailable as a witness until he announced, at 1:30 that he would testify.

Appellant Myers contends that Coffie could not have testified as a live rebuttal witness if his previous testimony had not been read to the jury. This overlooks the fact that, if the prior testimony had not been read to the jury, the government could have moved to reopen its evidence: the defense had no other evidence to present. See *United States v. Batie,* 457 F.2d 927 (5th Cir. 1972). Coffie's live testimony concerning the robbery would have been relevant in light of the fact he had pled guilty of the robbery and of Mrs. Olson's testimony that he had participated in it with appellant. In the event that Coffie had testified without the prior reading of his former testimony to the jury, the defense obviously could have used his former testimony to impeach him.

If the United States Attorney had informed defense counsel that Coffie would make his decision whether to testify by 1:30, the defense could have asked for a continuance until that time. But defense counsel could not have read the earlier Coffie testimony to the jury after he knew that Coffie would testify. The defense was on notice that Coffie might testify after the government was allowed to advise him in open court of its offer to him. This placed some responsibility on the defense to inquire of the United States Attorney, or of Coffie himself, as to his intentions prior to using Coffie's prior testimony. Defense counsel made no such inquiry. A different situation would be presented if there was evidence that any agent of the government misled the defense or the trial court concerning Coffie's intention to testify. There being no such evidence in the record, however, we find no error in the district court's allowing Coffie to testify at appellant's trial.

AFFIRMED.