Anthony Richard HAMILL,
Appellant (Defendant),

v.

The STATE of Wyoming, Appellee
(Plaintiff).

No. 5135.

Supreme Court of Wyoming.

Nov. 16, 1979.

Richard H. Honaker, Wyoming Public
Defender Program, Cheyenne, for appellant.

John D. Troughton, Atty. Gen., Gerald A.
Stack, Deputy Atty. Gen., and Berry F.
Laws, III, (argued) Legal Intern, for appellee.

Before RAPER, C. J., and McCLINTOCK, THOMAS, ROSE and ROONEY, JJ.

RAPER, Chief Justice.

Two questions are presented in this appeal. First, may a defendant, who in the course of a fairly continuous and protracted transaction during which he committed several clearly defined acts of sexual assault, be charged with, tried for, and convicted of multiple counts of sexual assault; or is the State required to elect one act of sexual assault in such a trial? The second issue, which is unrelated to the first, inquires whether a doctor-witness' unsolicited and unresponsive answer to a question asked by the prosecutor in which the doctor said the victim of the crime " * * * was the victim of a physical attack and probably even attempted murder," was so prejudicial as to require the granting of a motion for mistrial.

The district court judge instructed the jury that the defendant was charged with three counts of first degree sexual assault [1] and three special verdict forms permitted the jury to find the defendant either not guilty, guilty of attempted first degree sexual assault, or guilty of first degree sexual assault. The jury found the defendant guilty of first degree sexual assault in each instance.[2] The district court refused to grant defendant's motion for a mistrial because of the doctor's testimony.

We will affirm.

On December 11, 1977, the date the crimes here in question were committed, the defendant-appellant, Anthony Richard Hamill, was a paying guest at the Ramada Inn in Gillette, Campbell County. The victim of these crimes was the night clerk at the motel. She had first met the appellant on the preceding night when he registered as a guest. The victim talked with the appellant that first night and he told her quite a bit about himself. The victim testified that it was not uncommon for her to become acquainted and converse with the guests who populated the motel because many were workers who resided there for long periods of time. The victim began her workshift at 11:00 p. m. on December 10, 1977. About midnight, the appellant came to the registration desk and asked for change for a five dollar bill, which the victim provided to him. A little later, the appellant returned to the registration desk and asked for another key to his room because he had locked himself out. The victim provided him with a key.[3] The victim then testified that appellant again returned to the registration desk area at about 2:45 a. m. on December 11, 1977. She was sitting alone at her desk drinking a Coke and reading when she looked up and saw him. The appellant asked for yet another key to his room because he had again locked himself out. No other key was available and the victim could not locate the passkey. Appellant asked if people were ever permitted to sleep in the lobby and the victim indicated that it was all right if he wanted to sleep on the couch.

Because the appellant had a smell of liquor on him, the victim suggested perhaps he would like a cup of coffee. Appellant told her there wasn't much coffee left and would she mind making more. At first the victim was going to wait until the appellant left before making the coffee, but she decided she was being foolish, so she took the pot and walked to a small utility room behind the registration desk to get water. The appellant followed her. As the victim began drawing the water, she glanced over her shoulder and observed that the appel-

1. The appellant was originally charged with four counts of sexual assault, and it is not clear from the record just when and why the fourth count was dropped. We do not perceive any issue to have been raised in this regard in this appeal, nor was any such question addressed in the trial court.

2. Pursuant to § 6–4–306(b) and (c), W.S.1977, the district court imposed only one extended sentence for the multiple convictions, 20–45 years in the Wyoming State Penitentiary, a sentence of not less than five (5) years nor more than life being authorized where two (2) or more separate acts of sexual assault in the first or second degree are committed.

3. Two keys were found in the appellant's possession at the time of his arrest.

lant was wrapping a white silky cloth[4] around his fist. The next thing she knew he had that cloth around her neck and was strangling her. She dropped the coffee pot and clutched at the cloth around her neck. There was a period of struggle and the next thing the victim remembered was that she was lying on the floor and the appellant had an orange-colored broom handle[5] pressed against her throat. The victim testified that throughout the period of time during which the attack took place, she was in fear for her life. She told the jury that when she came to on the floor she was in something of a fog and that it was hard for her to speak because of the pressure of the broom handle on her throat. She stated that she asked the appellant, "* * * Why are you doing this to me, I haven't done anything to you, * * *" and that the appellant responded, "Yes, you have. You've teased me and you've provoked me and I have this coming from you." After a further exchange during which the victim apologized if she had done something to him and pleaded for him to stop, she testified:

"* * * he told me just to not to talk any more, that he had me in a position to kill me if I was going to give him any trouble."

The victim testified that she persuaded the appellant to desist from pressing the broom against her throat by telling him she would not scream or call for the police. When he did release the pressure on her throat, the victim noticed that her pants and underwear were pulled down around her ankles and that her turtleneck and bra were pushed up around her neck so that her body was totally exposed. The victim related that the appellant did not disrobe but rather had the coveralls he was wearing unzipped. He did not remove either the coveralls or his underwear[6] during the epi-

sode. Without going into unnecessary detail, the victim then related that the appellant committed upon her a series of sexual assaults: (1) He placed his fingers in her vagina and commanded her to recite names describing her genitalia; (2) He attempted to place his penis in her vagina but failed; (3) He succeeded in placing his penis in her rectum but stopped when she complained that it hurt; (4) He again attempted and succeeded in placing his penis in her vagina for a while. Because this did not seem to work, he commanded the victim to get down on her knees; and, when she refused, (5) he stuck his finger into her vagina, wiped it on his penis, and told her she had no choice and that he'd kill her if she did not do what he said. The victim then got down on her knees and the appellant (6) forcibly inserted his penis in the victim's mouth. Because this did not seem to work, the appellant laid down on the floor and commanded the victim to again (7) take his penis into her mouth, which she did. The appellant had ordered the victim to so situate herself so that at the same time he (8) inserted his tongue into her vagina.

When someone began pounding on the registration desk, the appellant allowed the victim to put on her clothes. The pounding ceased and shortly after the phone began to ring. The appellant allowed the victim to answer the phone although he accompanied her and held on to her arm while she talked on the phone. The appellant took the victim back into the utility room and asked her for her underwear which she took off and gave to him.[7] The appellant and the victim then returned to the registration desk area and he continued to converse with her for a period of time. An alarm went off during this conversation which told the victim she had to make a wake-up call. After the

---

**4.** Such a cloth, a piece of bed sheet, was found in the utility room and was introduced in evidence.

**5.** Such a broom was found in the utility room and introduced in evidence.

**6.** The victim described the appellant's underwear to the police when she made the report and again at trial. The appellant was wearing

such underwear at the time he was arrested. These under things were introduced in evidence.

**7.** A pair of women's underwear similar to those the victim described as wearing were found in the appellant's room when he was arrested. These underwear were introduced in evidence.

victim made the call, the appellant told her to put her hands up on the registration counter. The appellant then sat down on the floor, pulled down the victim's pants and again (9) inserted his tongue into her vagina. After this the appellant again sat down with the victim. She related their conversation:

"* * * he asked me what I was going to tell my husband about the way my neck looked. I didn't really know how my neck looked,[8] and I said, "Well, I don't know what I'm going to tell him,' I says, 'but when he finds out he's going to be after you.' And he said, 'I've seen your husband and he doesn't look too big and too tough, and if anybody comes to my door I've got a .357 and I'll just blow the door down.' * * *"

The phone rang again and the victim went to answer it. The appellant again followed her and again made her put her arms on the registration desk, again pulled down her pants and (10) inserted his tongue into her vagina.[9] The appellant desisted when someone walked into the registration desk area. The appellant stayed a while longer and talked with the victim. Somewhere in the neighborhood of 7:00 a. m. on December 11, 1977, the appellant left.

It is unnecessary for us to further recite the testimony and evidence that was made a part of the record in this case. The facts recited above are based upon the testimony of the victim given at the trial and we have footnoted some of the corroborating physical and circumstantial evidence. The appellant did not testify and he does not challenge his conviction except to raise two issues:

"The issues presented to the Court by this appeal are:

"1. Under Wyoming's new sexual assault law, if a man unlawfully inflicts

sexual intercourse, anal intercourse, fellatio, and cunnilingus on a woman during one continuous criminal transaction, can he be prosecuted for and convicted of separate counts of first degree sexual assault, or do the acts merge into a single offense of first degree sexual assault?

"2. Did the trial court's refusal to declare a mistrial after one of the State's witnesses volunteered the inadmissible statement that the prosecutrix was the victim of an attempted murder constitute prejudicial error?"

Appellant formulates his first argument, asserting that he was deprived of his liberty without due process of law and was subjected to double jeopardy because he was tried on four charges and convicted of three charges which arose from a single criminal transaction.

The appellant was charged under Wyoming's new sexual assault statute. Sexual assault in the first degree, in pertinent part, is defined to be:

"§ 6–4–302. *Sexual assault in the first degree.*

"(a) Any actor who inflicts sexual penetration * * * on a victim commits a sexual assault in the first degree if:

"(i) The actor causes submission of the victim through the actual application, reasonably calculated to cause submission of the victim, of physical force or forcible confinement; or

"(ii) The actor causes submission of the victim by threat of death, serious bodily injury, extreme physical pain or kidnapping to be inflicted on anyone and the victim reasonably believes that the actor has the present ability to execute these threats; * * *"

Sexual penetration is defined by the statute:

---

8. Photographs taken of the victim several hours after this ordeal, which were introduced in evidence, and the testimony of the physician who examined her, established that the victim's neck was markedly bruised and reddened. She had numerous other bruises and marks on her body which she testified happened during the assault on her.

9. The parenthetical numbers (1) through (10) placed in our narrative enumerate what can only be considered as ten separate and distinct instances which violated the person of the victim, each of which was committed at a different time—albeit they may have been very proximate in time.

"§ 6–4–301.  *Definitions.*

"*   *   *

"(ix) 'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, analingus or anal intercourse with or without emission;"

It is evident from the unambiguous language of the statute that the offense that the statute is intended to punish is the infliction of sexual penetration which is against the will of the victim—in this case, by use of force and by threats to the victim's life.  The actor is not to be punished because he has gratified or attempted to gratify his sexual desires but rather because he has violated the person of the victim.  Such a violation occurs if the actor commits any one of the acts described in § 6–4–301(a)(ix).  It would reward the defendant who has the greater criminal ambition with a lesser punishment to construe the statute otherwise.  See *People v. Perez,* 1979, 23 Cal.3d 545, 153 Cal.Rptr. 40, 44, 591 P.2d 63, 66–67.  The State asserts that the statute should be interpreted in such a way that if an actor commits more than one of the enumerated acts or if he commits one of the enumerated acts more than one time, multiple offenses have been committed.  A further contention of the State is that even if the acts were closely related in place and time, they are nonetheless distinct and individual acts and an actor who commits them may be charged with multiple offenses, tried for those multiple offenses and convicted of them.  We agree with the position of the State and hold that where separate and distinct incidents of sexual assault occur in different ways, each in a different time period or where the same type of sexual assault occurs more than once on the same victim in different time periods, each incident constitutes a separate definable criminal offense which can be prosecuted individually.  *People v. Perez,* supra at 591 P.2d 63;  *People v. Saars,* Colo.1978, 584 P.2d 622, 629;  *People v. Robinson,* 1978, 80 Mich.App. 559, 264 N.W.2d 58 (also see, *People v. Nelson,* 1977, 79 Mich.App. 303,

261 N.W.2d 299);  *State v. Bussiere,* N.H. 1978, 392 A.2d 151;  *State v. Ware,* 1977, 53 Ohio App.2d 210, 372 N.E.2d 1367;  *People v. Helton,* 1976, 39 Ill.App.3d 672, 349 N.E.2d 508;  *State v. Hill,* 1969, 104 Ariz. 238, 450 P.2d 696, 698;  *Padilla v. State,*[10] Wyo.1979, 601 P.2d 189 (1979).  Contra, *State v. Dorsey,* 1978, 224 Kan. 152, 578 P.2d 261 (see also dissenting opinions;  and see generally West's Digest System, Criminal Law, Key Number 29).

Each act charged against the appellant required proof of different facts and in this case there is ample evidence to support a separate charge and conviction for each act so charged.  The evidence shows separate violations involving sexual intercourse, cunnilingus, fellatio and anal intercourse, each with some essential facts different from the others.

The rule urged by appellant, which is stated in *State v. Tobin,* 1924, 31 Wyo. 355, 367–368, 226 P. 681, 685, does not have pertinence to a consideration of this issue.  The *Tobin* case was concerned with a gambling statute found in the Wyoming Compiled Statutes, 1920:

"§ 3389.  Every person who shall deal, play, carry on, open, or cause to be opened, or who shall conduct, either as owner or employe, whether for hire or not, any slot machine, game of faro, monte, roulette, lansquenette, rondo, vingt-un, commonly known as twenty-one, keno, props, or any other game played with cards, dice or other device of whatever nature, for money, checks, credit, or other representatives of value, shall be guilty of a misdemeanor, and on conviction thereof, shall be punished by a fine of not less than three hundred nor more than one thousand dollars, or by imprisonment of not less than three months nor more than one year, or by both."

In that case, counsel for the defendant claimed that the information was so defective and uncertain that it could not be said to charge a crime.  Although it was not

---

**10.** The issue addressed in this appeal was alluded to in the *Padilla* opinion although the issue was not clearly raised, briefed, or argued by counsel in the *Padilla* case.

clear that the issue was even preserved for appeal, the court in *Tobin* nonetheless determined that the information was sufficient and then, almost in an aside, stated:

"We might, however, in this connection, refer to the charge in the information that the defendant carried on and conducted games of faro, monte, roulette, lansquenette, etc. There was no pretense to prove that any games were carried on except twenty-one, poker and panguinqui. It is said:

" 'The rule is well settled that where a statute makes either of two or more *distinct acts connected with the same general offense, and subject to the same measure and kind of punishment,* indictable separately as distinct crimes when each shall have been committed by different persons *at different times,* they may, when committed, *by the same person at the same time,* be coupled in one count, as constituting altogether but one offense. In such case the several acts are considered as so many steps or stages in the same affair, and the offender may be indicted as for one combined act in violation of law; and proof of either of the acts mentioned in the statute and set forth in the indictment will sustain a conviction.'

"[Citations omitted.] While this is undoubtedly the rule, at the same time, we can see no good purpose subserved in charging acts, the commission of which cannot possibly be sustained by any evidence, and which simply tend to confuse the jury, and might, at least upon request, require instructions which otherwise would be unnecessary." *State v. Tobin,* supra, 31 Wyo. at 367–368, 226 P. at 685.

While we have no particular quarrel with this statement of law in the context in which it was made (gambling statute) and accepting that it is plainly dicta, we do not think it or other cases which are concerned with degrees of assault and battery or possession and delivery of drugs [11] are controlling insofar as the question which we are here dealing with is concerned.

■ We hold that the district court was correct in denying the appellant's motion to require the State to elect a single act as the basis of the prosecution and that neither the appellant's due process rights nor his right to not be placed twice in jeopardy was violated by the prosecution. No person shall "be twice put in jeopardy for the same offense," § 11, Art. I, Wyoming Constitution. No person shall be "subject for the same offense to be twice put in jeopardy of life or limb," Fifth Amendment, U.S. Constitution. It is not double jeopardy to be tried for several offenses arising out of the same episode in a single trial. *Vigil v. State,* Wyo.1977, 563 P.2d 1344.

The appellant formulates his second issue asserting that the district court abused its discretion in refusing to declare a mistrial after one of the State's witnesses (doctor) volunteered the incompetent and irrelevant statement that the victim was the subject of an attempted murder.

■ The testimony that is the source of concern appeared in the record thus (the doctor was being questioned about the physical symptoms he observed on the victim's body):

"Q. Would you say from observing all of the physical symptoms of the victim that the allegation of being sexually assaulted and also strangled were consistent with her physical symptoms?

"A. Yes. I believe she was sexually molested, but I could definitely say that she was the victim of a physical attack and probably even attempted murder."

We accept, as the State has so conceded, that the testimony was not admissible and it would have been error to have admitted it.[12] The prosecutor began asking another

---

11. See cases digested at West's Wyoming Digest, Criminal Law, ▮▮▮▮▮▮▮

12. The court, of course, did not admit the evidence. However, the effect of his ruling was to allow the evidence to remain before the jury. This court has held that evidence improperly admitted is not ground for reversal unless there is actual prejudice to the defendant. *Murdock v. State,* Wyo.1960, 363 P.2d 674.

question but was interrupted when counsel for the appellant asked to approach the bench. A conference was held at the bench during which appellant's counsel moved the court for grant of a mistrial. The district court deferred ruling on the motion until a later time and allowed the State to continue its examination of the witness. At the close of all the evidence, the motion for mistrial was renewed. The court asked if appellant was suggesting an instruction and appellant stated that he did not want an instruction because it would only serve to aggravate the situation. The court ruled:

"THE COURT: Well, the Court would instruct the jury to disregard that if counsel requested it. I don't believe that response was anticipated * * * by the Prosecution. But the Court would tend to agree with Mr. Norman that instructing on it would only be called to the mind of the jury and probably would not help. The Court doesn't feel, however, either, that it is so prejudicial as to require a mistrial, and will not grant the mistrial as requested."

No instruction was requested by appellant. We agree with the district court that the response was not so prejudicial as to require a mistrial. We perceive a close parallel between this allegation of error and one addressed by this court in *Goodman v. State*, Wyo.1979, 601 P.2d 178, pp. 187–188 (1979). In *Goodman*, it was asserted that a comment by the prosecutor was so prejudicial that a mistrial was required and no instruction could serve to eradicate the problem.

We are convinced that the error was in this case not prejudicial to the appellant. During the testimony of the victim, both direct and cross-examination, she stated no less than seventeen times that the appellant attempted to strangle or choke her and that he threatened to kill her on several occa-

sions. She repeatedly stated that her behavior during the entire episode was governed by the fear that the appellant would kill her if she made a false move. In view of this testimony, to which no objection was made, we cannot see any prejudice in the witness' unsolicited statement.[13] *Goodman v. State*, supra; see, *United States v. Woodring*, 10th Cir. 1971, 446 F.2d 733, 737. The specter of impending death in the mind of the victim was constantly before the jury as a part of the State's case. The statute, § 6–4–302(a)(ii), incorporates "threat of death" and "the present ability to execute these threats" to induce submission to sexual violations. Although we hold it error for the doctor to testify voluntarily as he did, the testimony comes near to admissibility as corroborating the victim's in that the injuries demonstrate that death could have ensued and that the victim's statements were not exaggerations. Certainly under those circumstances there could be no prejudice where the mention of attempted murder adds no new dimension.

We note that under the circumstances of this case it would have been best if the trial judge had made a ruling that the statement was not competent and directed the jury to disregard it at the time it came up, since at least from our comfortable perspective and opportunity to reflect, it was inadmissible. The effect of the district court's ruling was to place the appellant in the uncomfortable situation of having the matter recalled to the jury's attention at a later time—double coverage if you will. An oral directive by the district court to the jury at the time the statement was made that the jury should disregard the statement would have been the best possible solution. However, we cannot conceive the error so grave as to require a mistrial. The district court offered to instruct the jury to disregard the statement, and we think this adequate to

---

**13.** There was no attempt made by the appellant to demonstrate that the statement was other than inadvertent or unsolicited. Under such a circumstance, we are compelled to adopt the district court's specific finding (he was present and saw the exchange between the prosecutor and the witness) that the statement was inadvertent, unsolicited and not apparently the result of any prosecution coaching.

have covered the error. The appellant refused the judge's offer to instruct, and he is bound by his choice.

Affirmed.