**Kerry RIVERA, Appellant (Defendant),**

v.

**The STATE of Wyoming,
Appellee (Plaintiff).**

**No. 90–163.**

Supreme Court of Wyoming.

Oct. 30, 1992.

Rehearing Denied Jan. 5, 1993.

Wyoming Public Defender Program, Leonard D. Munker, State Public Defender, Donald K. Slaughter, Asst. Public Defender, Dave Gosar, Appellate Counsel, for appellant.

Joseph B. Meyer, Atty. Gen., Sylvia L. Hackl, Deputy Atty. Gen., Mary B. Guthrie, Deputy Atty. Gen., for appellee.

Before MACY, C.J., and THOMAS, CARDINE, URBIGKIT,* and GOLDEN, JJ.

THOMAS, Justice.

The primary issues in this case, emanating from convictions of sexual assaults on two minor girls, relate to the admissibility of evidence. Specifically, Kerry Rivera (Rivera) contends that error occurred in the admission into evidence of DNA profiling; in the admission of opinion evidence on his guilt; and evidence of other bad acts in violation of Wyo.R.Evid. 404(b). A further significant claim is raised with respect to violation of the double jeopardy clauses of the state and federal constitutions arising out of charges and convictions of indecent

---

* Chief Justice at time of oral argument.

liberties and sexual assault in each instance. Collateral issues include the claim of cumulative error and a claim of credit against the sentences imposed because of pretrial confinement. We hold no error occurred with respect to admission of evidence in this case but, in one instance, the charge of indecent liberties, while properly presented to the jury, merged into the charge of sexual assault for purposes of punishment. We accept the concession of the state with respect to the issue of pretrial confinement. The judgment and sentences of the trial court are affirmed except that one sentence for indecent liberties is set aside, and credit is to be properly awarded for pretrial confinement.

Rivera was charged with, and convicted of, first-degree sexual assault in violation of Wyo.Stat. § 6–2–302(a)(i) (1988) in one instance, and Wyo.Stat. § 6–2–302(a)(iii) (1988) [1] in the other instance, and violations of Wyo.Stat. § 14–3–105 (1986) [2] with respect to two separate minor female victims. In August of 1989, BJL, then sixteen years old, complained of a sexual assault by Rivera. In the course of the investigation of that complaint, law enforcement officers received information of an earlier assault

upon MB in March of 1988. MB also was sixteen years old at the time of the assault. The sexual assault count with respect to MB was charged as a violation of the provisions of § 6–2–302(a)(i), and the sexual assault against BJL was charged as a violation of the provisions of § 6–2–302(a)(iii). After a jury trial resulted in convictions on all counts, Rivera was sentenced to not less than five nor more than ten years on each charge of indecent liberties with a minor, and to not less than six nor more than ten years on each of charge of first-degree sexual assault, with the provision that all four sentences were to run concurrently. In addition, the judgment and sentence provided that Rivera was to "be given credit for time served in the Hot Springs County Jail, in the amount of 282 days, said credit to be applied against the minimum and maximum sentence ordered herein [emphasis added]."

In his Brief of Appellant, Rivera states the issues as follows:

I. Whether evidence of DNA profiling was properly admitted at trial.

II. Whether Appellant's constitutional right to a fair trial was abrogated when

(i) He is being sentenced for two (2) or more separate acts of sexual assault in the first or second degree;

\*   \*   \*   \*   \*   \*

(c) An actor convicted of sexual assault who qualifies under the criteria of subsection (b) of this section shall be punished as follows:
(i) Sexual assault in the first or second degree is a felony punishable by imprisonment for not less than five (5) years or for life;

\*   \*   \*   \*   \*   \*.

---

1. Wyo.Stat. § 6–2–302(a) (1988) provides, in pertinent part:
   (a) Any actor who inflicts sexual intrusion on a victim commits a sexual assault in the first degree if:
   (i) The actor causes submission of the victim through the actual application, reasonably calculated to cause submission of the victim, of physical force or forcible confinement;
   \*   \*   \*   \*   \*   \*
   (iii) The victim is physically helpless, and the actor knows or reasonably should know that the victim is physically helpless and that the victim has not consented; or \* \* \*.
   The penalty provision for the sexual assault statute is found in Wyo.Stat. § 6–2–306 (1988) which provides, in pertinent part:
   (a) An actor convicted of sexual assault who does not qualify under the criteria of subsection (b) of this section shall be punished as follows:
   (i) Sexual assault in the first degree is a felony punishable by imprisonment for not less than five (5) years nor more than fifty (50) years;
   \*   \*   \*   \*   \*   \*
   (b) An actor who is convicted of sexual assault shall be punished by the extended terms of subsection (c) of this section if:

2. Wyo.Stat. § 14–3–105 (1986) provides:
   Any person knowingly taking immodest, immoral or indecent liberties with any child or knowingly causing or encouraging any child to cause or encourage another child to commit with him any immoral or indecent act is guilty of a felony, and upon conviction shall be fined not less than one hundred dollars ($100.00) nor more than one thousand dollars ($1,000.00) or imprisoned in the penitentiary not more than ten (10) years, or both.

the trial court admitted testimony in contravention of *Bennett v. State*.

III. Whether Appellant's constitutional right to be free from double jeopardy was violated.

IV. Whether the trial court improperly admitted evidence of purported prior bad acts.

V. Whether Appellant's convictions should be reversed pursuant to the doctrine of cumulative error.

VI. Whether Appellant should be credited with 282 days time served to be credited against the maximum and minimum terms of all phases of Appellant's concurrent sentences.

The State of Wyoming includes the same issues in its Brief of Appellee, but it restates them in this fashion:

I. Whether the testimony relating to DNA profiling was properly admitted.

II. Whether a clinical psychologist, a school counselor and a hospital social worker gave their opinions on the Appellant's guilt.

III. Whether the Appellant should have been tried for first degree sexual assault and taking indecent liberties with a child.

IV. Whether evidence of earlier assaults by the Appellant was properly introduced under Rule 404(b), W.R.E.

V. Whether there was cumulative error.

VI. Whether Appellant should have been given credit on concurrent sentences for pretrial incarceration.

The investigation of Rivera was instituted because of a complaint by BJL that she had been sexually assaulted in August, 1989. BJL had been drinking beer at a party that night, and she testified that she was intoxicated. Earlier in the evening, after an argument with her boyfriend, she had broken up with him. She was discussing this with Rivera and his wife, and Rivera invited her to stay at their home for the night. Rivera's wife had gone to bed in the bedroom; Rivera was in the living room on the couch; and the victim was in the living room on the floor while they talked. BJL then dozed off, but was awakened because Rivera and his wife were arguing about the light being on in the bedroom. Her sleep was interrupted more than once by that argument which apparently terminated when Rivera removed the light bulb.

BJL fell asleep, again, but awakened later to discover that Rivera had pulled down her jeans and panties past her knees. He was on top of her and had achieved penetration of her vagina with his penis. BJL told Rivera to get off of her and, after a while, he complied and went into the bathroom. BJL got up and went to her boyfriend's apartment which was nearby. She told her boyfriend what had happened and spent the rest of the night at his apartment. Although BJL testified that she slept in the same bed with her boyfriend, she said they did not engage in sexual intercourse. The following morning, the boyfriend took BJL to the police station where she made her complaint against Rivera. The police officers then took her to the hospital where a medical examination, including the utilization of a rape kit, was performed. Charges of sexual assault and indecent liberties with a minor were filed against Rivera.

The police officer investigating the accusation by BJL learned that MB might have information that was material. The officer and the prosecutor sought out MB as a witness. Their investigation revealed MB contacted her school counselor; told the counselor that she had been raped by Rivera; and sought the counselor's advice with respect to whether she should tell the investigator and the prosecutor. The counselor advised she should tell them about this event.

MB disclosed these facts to the police officer and the prosecutor. In March of 1988, MB and her father were living with relatives (MB's aunt and her husband), who also were Rivera's future in-laws, in a dwelling in Thermopolis. Rivera was a member of that household. MB and Rivera were alone in the house when MB went to Rivera's fiancee's bedroom to obtain a typewriter with which to do her homework. At that time, Rivera asked her to rub his back. While she was administering the back rub, Rivera grabbed her hand and shoved it down his pants, making contact

with his penis. MB protested, and Rivera then threw her on the bed and, despite her insistence that he should stop and leave her alone, he accomplished sexual intercourse with penetration. When he was finished, he left the room, after telling her not to tell anyone.

MB immediately took a shower because she felt "dirty." The next day, she wrote a letter to her sister, informing she had been raped by Rivera. She asked her sister to throw the letter away after reading it because she was afraid someone else would read it and find out about the rape. The day after the incident, MB told a friend that she had been raped by Rivera. About a week later, she called the sister to whom she had written the letter and discussed the rape with her. At that time, MB told her sister she had not told anyone else in the family because she was afraid it would cause problems with everyone and her aunt would make her and her father move out of the house where they were living. The charges of sexual assault in the first degree and indecent liberties with a minor then were filed alleging the violation of MB and later were consolidated with the same charges arising out of the complaint of BJL. Additional facts will be included in connection with the discussion of issues asserted by Rivera.

We first address the issue of testimony as to the truthfulness of the victims by a clinical psychologist, a social worker at the hospital, and the high school counselor. Rivera's claims are far-ranging, although his reference specifically to *Bennett v. State*, 794 P.2d 879 (Wyo.1990), would seem to focus upon testimony of an opinion as to Rivera's guilt. The claims seem to include an attack upon admissibility of the evidence encompassing the rape trauma syndrome, move to argument about the testimony of experts amounting to a comment on the veracity of the victims, and then culminate in the claim that the testimony constituted a comment upon Rivera's guilt. None of these contentions are sustained by the record in the case or precedent in Wyoming.

Rivera did file a motion in limine to suppress testimony concerning "Post–Traumatic Stress Syndrome" (the rape-trauma syndrome) which was denied. The witnesses whom Rivera includes in this asserted issue testified in the following order: the police officer; the hospital social worker; an emergency medical technician at the hospital; the nurse who assisted in BJL's medical examination; the examining physician; the victims; the school counselor; and the clinical psychologist. The police officer testified that he had investigated 250 to 300 rapes and that absence of physical injuries was not unusual. He also testified about his observation of the way victims behaved, and how BJL acted in his presence at the initiation of the investigation. The hospital social worker testified about the reactions in general of rape victims as she had observed them. She also testified as to BJL's behavior and demeanor before, during, and following the medical examination that was performed. The testimony of the emergency medical technician and the examining nurse, respectively, was of the same tenor. The examining physician stated BJL's demeanor was "flat," somewhat depressed, and tearful at times. Of course, the testimony of the victims included not only the actual events of the sexual assaults but, in addition, their reactions and feelings with respect to what had occurred. The high school crisis counselor testified about MB's emotional state while discussing the assault upon her and her reactions to that assault with the counselor. The clinical psychologist testified as an expert, discussing the symptoms of rape victims in general, and the stages and the timing of the stages that victims of sexual assault go through. He also testified it is not unusual for female victims of sexual assaults not to report the sexual assaults and discussed their feelings of shame and their feelings that the assault may have been caused by some conduct on their part, that is, it may have been their fault. None of these witnesses expressed an opinion as to the credibility of the victims, nor did they state any opinion as to Rivera's guilt or innocence.

Expert testimony that discusses the behavior and characteristics of sexual assault victims and the range of responses to sexual assault encountered by experts is admissible. *Scadden v. State*, 732 P.2d 1036 (Wyo.1987). Such testimony is relevant and helpful in explaining to the jury the typical behavior patterns of adolescent victims of sexual assault. *Griego v. State*, 761 P.2d 973 (Wyo.1988). It assists the jury in understanding some of the aspects of the behavior of victims and, so long as there is no comment on the credibility or truthfulness of the victims, it does not invade the province of the jury. *Zabel v. State*, 765 P.2d 357 (Wyo.1988). The order of the testimony of the witnesses at Rivera's trial, together with the testimony of the victims, was a skillful, strategic, and tactical decision of the prosecutor. Even though the testimony did corroborate the victims, and one effect of corroboration is to support or bolster the credibility of the witnesses, that does not amount to a violation of the rule against vouching for credibility.

Under our cases, an expert is permitted to state an opinion that someone is a victim of sexual assault but, of course, that expert cannot vouch for the credibility of the victim. It is well established in our jurisprudence that the jury is the arbiter of truthfulness or credibility, and the expert is not permitted to infringe upon that prerogative of the jury by those qualities in the victim. *Lessard v. State*, 719 P.2d 227 (Wyo.1986). This case is not, in any way, analogous to *Stephens v. State*, 774 P.2d 60 (Wyo.1989), in which Stephens was identified by an expert witness when asked if he had an opinion as to who was the perpetrator of the sexual assault.

The jury that tried Rivera was instructed that it was not bound to accept expert testimony as conclusive. The jury also was told it was up to them to decide what weight to give to this testimony as well as to the testimony of the victims. We discern no error in admission of testimony of these witnesses relating to the rape trauma syndrome or the behavior and reactions of the victims. There was no testimony vouching for the credibility of the victims, nor was there any testimony constituting an opinion as to Rivera's guilt.

Rivera also argues a claim of evidentiary error arising out of the improper admission into evidence of other uncharged bad acts contrary to Wyo.R.Evid. 404(b). He contends admission of this evidence violated the constitutionally guaranteed right that he must be presumed innocent. Rivera included in his motion in limine a claim that evidence of other bad acts should be excluded. That motion was denied based upon the affirmation by the prosecution that the testimony would demonstrate motive, intent, or plan. Wyo.R.Evid. 404(b) provides as follows:

> *Other crimes, wrongs, or acts.*—Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, **such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident** [emphasis added].

At trial, the prosecution called as witnesses two young women who lived in Utah. One of those witnesses testified that in June of 1989, after the assault upon MB but prior to the assault on BJL, she had passed out after consuming too much alcohol at a party. At that time, she was fifteen years old. She was awakened because Rivera was fondling her. She changed sleeping places with her boyfriend who was sleeping beside her but, again, she was awakened by Rivera fondling her. She also testified that, even after she asked him to stop this activity, it still took him a while to desist. She also testified that the following weekend when she was ill she, again, was awakened to find Rivera fondling her.

The other witness testified that, during the summer of 1989, she had taken a prescription drug that causes drowsiness. She awoke to find Rivera straddling her and trying to pull her pants down. We note significant similarities in the cases of BJL and both of the Utah victims. All were

friends or acquaintances of Rivera's wife; all had been under the influence of alcohol or, in one instance, a prescription drug that induced drowsiness; and all were sleeping so that they could not consent and, to a degree, were helpless. In each Utah instance, when the victim awakened, Rivera reacted as if nothing was wrong, and he told each of these victims either that he wanted them or they wanted him and he would stop if that was what they wanted. A similar comment was offered by Rivera when BJL awakened.

In *Bishop v. State*, 687 P.2d 242 (Wyo.1984), *cert. denied*, 469 U.S. 1219, 105 S.Ct. 1203, 84 L.Ed.2d 345 (1985), this court approved, from *United States v. Myers*, 550 F.2d 1036 (5th Cir.1977), *appeal after remand*, 572 F.2d 506 (5th Cir.1978), *cert. denied*, 439 U.S. 847, 99 S.Ct. 147, 58 L.Ed.2d 149 (1978), five factors to be invoked with respect to the admissibility of evidence of other crimes. The five factors quoted from *Myers* that are applied in considering the admission of testimony pursuant to Wyo.R.Evid. 404(b) are:

> (1) Proof of the other similar crimes must be plain, clear and convincing.
> (2) The other crimes must not be too remote in time from the charged offense.
> (3) The evidence of the other crimes must be introduced for a purpose sanctioned by Rule 404(b) of the Federal Rules of Evidence [Wyo.R.Evid. 404(b)].
> (4) The element of the charged offense that the evidence of other crimes is introduced to prove must be a material issue in the case.
> (5) There must be a substantial need for the probative value of the evidence of the other crimes.

*Myers*, 550 F.2d at 1044.

The *Bishop* criteria have been invoked repeatedly and were confirmed as recently as *Britton v. State*, No. 91–190, 1992 WL 170954, —— P.2d —— (Wyo. July 23, 1992). We have held these criteria do not control a trial court's discretion and the evidence still may be admissible even though one of these factors is not satisfied. *Story v. State*, 721 P.2d 1020 (Wyo.1986), *cert. denied*, 479 U.S. 962, 107 S.Ct. 459, 93 L.Ed.2d 405 (1986). Assuming the evidence qualifies under the *Bishop* criteria, then Wyo.R.Evid. 404(b) specifically permits the introduction of evidence disclosing other crimes or bad acts to show intent, motive, plan, or identity.

Rivera insists the only reason for using the testimony of the Utah victims was to demonstrate that, since he may have committed other bad acts in Utah, he must have committed the crimes he was accused of in Wyoming. It is clear Wyo.R.Evid. 404(b) forbids the use of evidence of a person's character to establish he acted in conformity therewith on a particular occasion. *Carey v. State*, 715 P.2d 244 (Wyo.1986), *cert. denied*, 479 U.S. 882, 107 S.Ct. 270, 93 L.Ed.2d 247 (1986); *Ortega v. State*, 669 P.2d 935 (Wyo.1983). So long as the *Bishop* criteria are met, however, and the permitted purpose for the testimony is demonstrated to be in conformance with Wyo.R.Evid. 404(b), the evidence is admissible.

The testimony of the two victims in Utah not only tended to support the credibility of the victims in the charged cases, but it corroborated the testimony of those victims. *See Gezzi v. State*, 780 P.2d 972 (Wyo.1989). Further, it disclosed motive by demonstrating a common style of misconduct to achieve sexual gratification and served to demonstrate Rivera planned and intended to effect sexual intrusion in each instance. Evidence of other crimes or misconduct to demonstrate a plan simply depends upon a showing of a relationship between the crimes and the defendant. *Bishop*. These prior bad acts also corroborated identity. Under our case authority, identity is a material issue in any case for purposes of applying Wyo.R.Evid. 404(b). *Pena v. State*, 780 P.2d 316 (Wyo.1989). As set forth in *Pena*, this court affords deference to the determination of a trial court with respect to the admissibility of evidence of other crimes under Wyo.R.Evid. 404(b). *See also Noetzelmann v. State*, 721 P.2d 579 (Wyo.1986); *Bishop*. As long as there is a legitimate basis for the court's decision, we cannot say that an

abuse of discretion is present. *Pena; Trujillo v. State,* 750 P.2d 1334 (Wyo.1988).

From our analysis of the record, we conclude the testimony of the Utah victims meets the factors identified in the *Bishop* test. Both of these young women testified, clearly and without contradiction, that Rivera attempted a sexual assault upon each of them at a time when they were unable to consent and were helpless. Both of those assaults occurred during the summer of 1989, which is not remote in time from the offenses with which Rivera was charged. The material issues that this evidence was offered to demonstrate, and helped to establish, were Rivera's intent, motive, plan, and identity, all of which are permitted by Wyo.R.Evid. 404(b). Our cases demonstrate that, in a sexual assault case, the substantial need for such evidence is present.

The trial judge considered these factors in arriving at his ruling on Rivera's motion in limine. He rather carefully weighed probative value against the countervailing factors found in Wyo.R.Evid. 403 and did this in the context of the procedure suggested in *Coleman v. State,* 741 P.2d 99 (Wyo. 1987). We agree that, in this case, the probative value of these other bad acts outweighs the danger of unfair prejudice (Wyo.R.Evid. 403) because the clear and unrebutted testimony of the victims with respect to the charged assaults would not necessarily result in Rivera's conviction. The trial court did not commit any abuse of discretion in the admission of the evidence of the other uncharged bad acts.

■ Rivera asserts error in the introduction of evidence concerning a DNA profile. DNA alludes to deoxyribonucleic acid, which is a molecule that carries the genetic information about humans in nearly all of the cells of the body. The configuration of DNA is different for each individual, with the exception of identical twins, and its characteristics continue unchanged during life. Rivera essentially concedes the general admissibility of this information in the course of his brief, and the true focus of his claim of error is upon the testimony of the expert relating the fact that he would expect to find a similar DNA pattern only in one individual out of 250,000 in the caucasian population. Specifically, Rivera's concern is that the introduction into evidence of statistical information invaded the province of the jury in this instance.

The parties discuss the general admissibility of such evidence under the test of relevancy found in *Cullin v. State,* 565 P.2d 445 (Wyo.1977), or in accordance with the criteria articulated in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923). In *Buhrle v. State,* 627 P.2d 1374 (Wyo.1981), we quoted from *Dyas v. United States,* 376 A.2d 827 (D.C.App.1977), *cert. denied,* 434 U.S. 973, 98 S.Ct. 529, 54 L.Ed.2d 464 (1977), a test for admissibility of expert witness testimony, the third factor of which is similar to the *Frye* criteria. Under either the *Cullin* or *Frye–Dyas* approach, we are satisfied that evidence of the results of DNA profiles is admissible.

■ While the parties have not couched their arguments within the Wyoming Rules of Evidence, we are satisfied a correct approach, rather than invoking *Cullin* or *Frye,* would be to analyze the admissibility of scientific evidence in accordance with those rules. Essentially, both the relevance of the evidence and the expertise of the witness are addressed in Wyo.R.Evid. 702. When such testimony is admitted, then the succeeding rules, Wyo.R.Evid. 703 through 705, may be invoked. We add only the caveat that the opinion of the expert in a criminal case cannot embrace the witness' conclusion as to guilt or innocence. *Stephens.*

A majority of the appellate courts that have addressed the issue have concluded such evidence is generally accepted as reliable within the scientific community and, in most instances, have espoused the utilization of the restriction fragment length polymorphism (RFLP) technique that was invoked by the federal bureau of investigation laboratory and its expert in this case. *United States v. Jakobetz,* 747 F.Supp. 250 (D.Vt.1990), *aff'd,* 955 F.2d 786 (2nd Cir. 1992) *cert. denied,* —— U.S. ——, 113 S.Ct. 104, 121 L.Ed.2d 63 (U.S.1992); *State v. Pennell,* 584 A.2d 513 (Del.Super.1989);

*Martinez v. State,* 549 So.2d 694 (Fla.App. 5 Dist.1989); *Caldwell v. State,* 260 Ga. 278, 393 S.E.2d 436 (1990); *Cobey v. State,* 80 Md.App. 31, 559 A.2d 391 (1989), *cert. denied,* 317 Md. 542, 565 A.2d 670 (1989); *People v. Shi Fu Huang,* 145 Misc.2d 513, 546 N.Y.S.2d 920 (1989); *State v. Pennington,* 327 N.C. 89, 393 S.E.2d 847 (1990); *State v. Pierce,* 64 Ohio St.3d 490, 597 N.E.2d 107 (1992), *reh'g denied,* 65 Ohio St.3d 1436, 600 N.E.2d 679 (1992); *State v. Ford,* 301 S.C. 485, 392 S.E.2d 781 (1990); *Mandujano v. State,* 799 S.W.2d 318 (Tex. App. Houston 1st Dist.1990); *Spencer v. Commonwealth,* 240 Va. 78, 393 S.E.2d 609 (1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 281, 112 L.Ed.2d 235 (1990); *State v. Woodall,* 182 W.Va. 15, 385 S.E.2d 253 (1989). In addition to this precedent from other jurisdictions, that we find persuasive, we note the legislature of the state of Wyoming has set a policy tone in recognizing genetic testing in connection with paternity issues. Wyo.Stat. § 14-2-111(c) (1992 Supp.).

■ Since the scientific reliability of this DNA technique generally is accepted, in ruling upon the offer of such evidence in Wyoming, our trial courts need only be concerned with the requisite foundation. Because it does appear the possibility of an erroneous result is more likely to arise from the testing techniques than from the procedure, it is important for the trial court to be satisfied about the manner in which the testing was performed, and the qualifications of the individual who accomplished the scientific technique. These factors, however, are no different from those generally related to the acceptance of scientific evidence from an expert, and we do not perceive we are formulating any new law.

■ One matter that has been of concern to one court is testimony about the statistical probability of duplication. In *State v. Schwartz,* 447 N.W.2d 422 (Minn. 1989), the court held it was error for the trial court to permit testimony from the expert that the frequency of the DNA pattern in issue in the caucasian population was approximately one in thirty-three billion. The court noted recent publicity that

implied infallibility with respect to DNA testing, and its conclusion was that juries dealing with such complex technology might give undue weight and deference to such evidence. In *Pearson v. State,* 811 P.2d 704 (Wyo.1991), this court was concerned with a claim of error because of a statistical argument by the prosecutor. We found no error in that case, but we did note that the claim related to argument, not evidence.

The expert witness at Rivera's trial testified that the probability of duplication based upon his test results would be one in 250,000, a marked difference from the one in thirty-three billion involved in *Schwartz.* Nevertheless, we consider this claim of error in light of *Stephens,* 774 P.2d 60. Our conclusion is that, at some level, the statistical probability could be perceived as an opinion by the expert that the accused is guilty. At least, it would be possible for the jury to draw that inference from statistical probabilities associated with the DNA evidence alone. We, therefore, believe the better practice in Wyoming should be to not refer to the statistical probability of duplication when introducing DNA test results.

In this particular instance, the DNA evidence was corroborative of the testimony of BJL. The corroboration went to both identity and the fact of penetration. We are satisfied, however, that the case presented by the State was sufficiently strong that the testimony as to probability of duplication, if it were identified as error, constituted only harmless error.

■ Rivera next contends his constitutional right not to be twice placed in jeopardy was violated because as to each of the victims he was charged with sexual assault and with taking indecent liberties with a minor. We repeatedly have noted the three-fold impact of the double jeopardy clause. We have said that it prohibits a second prosecution for the same offense after an acquittal; a second prosecution for the same offense after a conviction; and multiple punishments for the same offense. *Birr v. State,* 744 P.2d 1117 (Wyo.1987), *cert. denied,* 496 U.S. 940, 110 S.Ct. 3224,

110 L.Ed.2d 671 (1990); *Tuggle v. State*, 733 P.2d 610 (Wyo.1987); *Garcia v. State*, 777 P.2d 1091 (Wyo.1989). In this case, we are concerned with the third aspect of the protection against double jeopardy, that is multiple punishments for the same offense.

■ We already have noted that, as to each victim, Rivera was charged with violation of §§ 6–2–302(a) and 14–3–105. These statutes define different crimes. *McArtor v. State*, 699 P.2d 288 (Wyo.1985). They are intended to suppress different evils; an acquittal and conviction under one does not prevent prosecution under the other. *Goodman v. State*, 601 P.2d 178 (Wyo. 1979). In *Baum v. State*, 745 P.2d 877 (Wyo.1987), we held there is no violation of a defendant's fundamental right to not be placed twice in jeopardy under the Fifth Amendment to the Constitution of the United States or under art. 1, § 11 of the Constitution of the State of Wyoming when conviction and punishment on two counts occurs even though both acts were committed during the same encounter with the victim. Under two separate statutes, two separate criminal acts can be charged, tried, and punished.

Our rule is like that articulated in *People v. Hairston*, 46 Ill.2d 348, 263 N.E.2d 840 (1970), *cert. denied*, 402 U.S. 972, 91 S.Ct. 1658, 29 L.Ed.2d 136 (1971), in which the court held that two or more distinct offenses may emanate from the same transaction or act, and the rule that a person cannot be put twice in jeopardy for the same offense is not applicable where two separate and distinct crimes are committed by one and the same act. In *Hamill v. State*, 602 P.2d 1212 (Wyo.1979), we have a clear example of repeated violations of the same statute in the perpetration of sexual assaults. We held there that the legislature intended to protect the victim against each identifiable sexual penetration. Consequently, even though a continuing course of conduct was involved, each penetration constituted a separate and distinct crime. In *Baum*, we held that, if different criminal acts are at issue, supported by different factual evidence, even though they are separated in time by only a few seconds, one

offense is not included in the other. "The defendants can properly be punished for [all], under different, or the same, statutory provisions." *Baum*, 745 P.2d at 882 (quoting *State v. Molitoni*, 6 Haw.App. 77, 711 P.2d 1303, 1306 (1985), quoting in turn *State v. Pia*, 55 Haw. 14, 514 P.2d 580, 584–85 (1973)).

■ When we compare this body of law with the evidence in this case, we note that, in the assault upon MB, Rivera first grabbed her hand and thrust it down the front of his pants, making contact with his penis. This event was a separate offense from the sexual assault upon MB, and the evidence justified a conviction by the jury for violation of § 14–3–105, indecent liberties with a minor. When Rivera sexually assaulted and penetrated MB a few minutes later, he committed a violation of § 6–2–302(a)(i), sexual assault in the first degree. Under our precedents, we hold it was lawful to charge Rivera with both offenses and to sentence him for both offenses after conviction on both. The judgment and sentences are affirmed in that regard.

■ With regard to the charges against BJL, we encounter a different situation. BJL was awakened to discover Rivera was on top of her and had penetrated her vagina with his penis. The circumstances demonstrate that, in order to accomplish the sexual assault, he had pulled her jeans and panties down past her knees. The jury could have determined, in convicting Rivera, that pulling down BJL's clothes constituted a separate and distinct act from the sexual assault. In this instance, however, that conduct was a part of, and necessary to, the accomplishment of the sexual assault. The penetration could not have been accomplished without removal of BJL's clothing.

■ In *Vigil v. State*, 563 P.2d 1344 (Wyo.1977), we discussed the filing of multiple charges and the separate verdicts on those charges returned by the jury. The court introduced the subject in this way:

There are here separate crimes that have been charged and proven. All arise

from the same event but each involves a separate victim and courts are protective of the individual citizen subjected to the criminal conduct of another. We have compiled cases in which there were separate charges, entangling more than one citizen victim, arising out of one occurrence in which courts have held there to be no double jeopardy and imposed multiple· punishments, in some cases concurrent and in others consecutive or by combinations of those sentencing techniques. The precise question is addressed to the asserted error of failure of the trial court to dismiss all or part of the counts on the grounds of double jeopardy and fair trial.

*Vigil,* 563 P.2d at 1351.

Dismissal of one or the other of the charges is precisely the relief sought by Rivera in this instance. Yet, the thrust of *Vigil* is that no prejudice attaches to charging, trying, and submitting multiple offenses to the jury and receiving separate verdicts. In *Vigil,* the third style of protection afforded by the constitutional prohibition was not in issue because, in that case, the trial court had imposed only one sentence. In this instance, we note the several sentences were imposed to run concurrently.

An apt description of the doctrine of merger of offenses for sentencing is found in *Commonwealth v. Whetstine,* 344 Pa.Super. 246, 496 A.2d 777 (1985), as that doctrine has been developed in Pennsylvania.

In deciding whether offenses merge, the question is whether the offenses charged "necessarily involve" one another, or whether any àdditional facts are needed to prove additional offenses once the primary offense has been proven. In deciding merger questions, we focus not only on the similarity of the elements of the crimes, but also, and primarily, on the facts proved at trial, for the question is whether those facts show that in practical effect the defendant committed but a single criminal act.

Additionally, we note that analysis of merger claims traditionally has revolved around the concept of injury to the sovereign; in order to support the imposition of more than one sentence, it must be found that the defendant's conduct constituted more than one injury to the Commonwealth.

*Whetstine,* 496 A.2d at 779–80 (citations omitted).

In disposing of the double jeopardy issue relating to the charges naming BJL as the victim, we hold the State was entitled to charge both offenses, and it was entitled to have them presented to the jury. The State had no way of anticipating how the evidence may be perceived by a jury or what the conclusion of the jury might be with respect to the charged offenses. Once the jury convicted Rivera of both charges, however, the charges in the case of BJL merge for purposes of punishment, and only one sentence should have been imposed. In the context of the *Whetstine* rationale, only one injury occurred to the State in this instance. We, therefore, hold the sentence for the indecent liberties charge in the case in which BJL was a victim should be vacated. This acknowledges Rivera's right not to be placed twice in jeopardy for the same offense and affords an adequate accommodation to the constitutional prohibitions.

We have held there was no error in connection with the specific claims of error by Rivera. In the absence of error, there can be no claim of cumulative error, and we do not consider that contention of Rivera any further.

■■■ The State of Wyoming has conceded that, pursuant to precedent in this state, it is necessary the judgment and sentence be amended to afford Rivera credit for pretrial incarceration on all of the concurrent sentences. This concession by the State is correct. *See Prejean v. State,* 794 P.2d 877 (Wyo.1990); *Weedman v. State,* 792 P.2d 1388 (Wyo.1990). In this instance, a remand to the district court is not necessary to accomplish that amendment to the judgment and sentence, and our holding in this regard affords adequate notice to the executive branch of government that the credit is to be given on all of the concurrent sentences. As modified by

the vacation of one sentence and the requirement for credit against each of the remaining sentences for the full presentence confinement, the concurrent sentences are affirmed.

We hold there was no reversible error in connection with Rivera's trial and conviction. As modified, the judgment and sentences are affirmed.

URBIGKIT, Justice, concurring in the opinion.

I concur in the decision and in the opinion. However, this court should proceed with some caution in any acceptance that DNA profile testing is scientifically infallible. Some current literature and recent cases are developing concern about the possibility of significant error. Most authorities agree that error can occur, dependent upon a number of factors, including simple carelessness in application of any particular procedure. Abstract certainty does not exist for infallibility. *United States v. Two Bulls*, 925 F.2d 1127 (8th Cir.1991) (vacated upon death of defendant during en banc rehearing); *Com. v. Curnin*, 409 Mass. 218, 565 N.E.2d 440 (1991); *People v. Castro*, 144 Misc.2d 956, 545 N.Y.S.2d 985 (1989); Larry G. Butler, *State v. Davis: DNA Evidence and the Use of Frye in Missouri*, 60 UMKC L.Rev. 577 (1992); Don J. DeBenedictis, *DNA Report Raises Concerns*, 78 ABA Journal 20 (July 1992); Stephanie B. Goldberg, *A New Day for DNA?*, 78 ABA Journal 84 (April 1992); Kathryn Korkos Theofilos, Note, *DNA Fingerprinting: The Definitive Evidence in a Criminal Trial*, 22 Mem.St.U.L.Rev. 319 (1992); William C. Thompson & Simon Ford, *DNA Typing: Acceptance and Weight of the New Genetic Identification Tests*, 75 Va.L.Rev. 45 (1989). Compare *People v. Barney*, 8 Cal.App.4th 798, 10 Cal.Rptr.2d 731 (1992), questioning lack of standardization for laboratory procedures.

In a few years, it may be recognized that DNA profile testimony, although continuing as useful evidence, is not completely safe from error. Our understanding of the variations in DNA testing parallels current scientific analysis and conclusions about the accuracy of another field of scientific testing. Many experts have now recognized that impaired driver determinations from alcoholic beverage consumption established by breathalyzer testing does not always prove inability or impaired ability to safely drive. The presence of multiple variable factors, relating to differences among individuals, may affect the reliability within the normal range for the establishment of impairment to drive. 2 Donald H. Nichols, *Drinking/Driving Litigation* §§ 23:07 through 23:31 and §§ 23:32 through 23:61 (1992). *See* 4 Donald H. Nichols, *Drinking/Driving Litigation*, Bibliography: Scientific Literature (1992) and Lawrence Taylor, *Drunk Driving Defense* § 6.4.4, at 672 (3rd ed. 1991).

DNA profiling can create equipment, method, sample, and genetic variances which may likewise require clear standards and continually applied skepticism about accuracy. Edward J. Imwinkelreid, *The Debate in the DNA Cases Over the Foundation for the Admission of Scientific Evidence: The Importance of Human Error as a Cause of Forensic Misanalysis*, 69 Wash.U.L.Q. 19 (1991).