Randy Lee OWEN, a/k/a Randy Lee Owens, Appellant (Defendant),

v.

The STATE of Wyoming, Appellee (Plaintiff).

No. 94–252.

Supreme Court of Wyoming.

Aug. 28, 1995.

191

Sylvia L. Hackl, State Public Defender; and Deborah Cornia, Appellate Counsel, for appellant.

William U. Hill, Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Mary Beth Wolff, Senior Assistant Attorney General; Theodore E. Lauer, Director of the Prosecution Assistance Program; and Bruce Horton and Nell C. Howell, Student Interns for the Prosecution Assistance Program, for appellee.

Before GOLDEN, C.J., and THOMAS, MACY, TAYLOR and LEHMAN, JJ.

MACY, Justice.

Appellant Randy Owen appeals from the judgment and sentence which was entered after he was convicted of one count of sec-

ond-degree sexual assault, one count of incest, and one count of immodest, immoral, or indecent liberties with a minor child.

We affirm as modified.

## ISSUES

Owen presents the following issues for our review:

*Issue I*

Did multiple charges and convictions for one event constitute a double jeopardy violation against multiple punishments for one offense?

*Issue II*

Did the admission of the victim's hearsay statements to a physician and a counselor deprive the Appellant of his constitutional right to confrontation?

*Issue III*

Whether trial counsel's deficient performance deprived the Appellant of his State and Federal Constitutional rights to effective assistance of counsel.

## FACTS

Owen was charged with one count of second-degree sexual assault, one count of indecent liberties, and one count of incest. These crimes were alleged to have been committed on the same person—Owen's daughter. The State alleged that Owen inserted his finger into the genital opening of his daughter who was then approximately seven years old.

While Owen's eight-year-old son was watching television in the living room one evening sometime between December 25, 1993, and January 1, 1994, he saw his father touch his sister with his finger on her private area. Approximately three days after this incident happened, the son told his mother about it. The children's mother contacted the Department of Family Services and filed a report. Thereafter, the children and their mother met and talked with a social worker and a police officer. Owen's daughter was taken to see a physician as well as a mental health therapist. All these individuals testified for the State at Owen's trial.

The defense attorney called Owen and several other witnesses in an attempt to show that Owen had not been spending the nights with his family during the time in question and that his ex-wife was simply a scorned woman who was seeking revenge.

After a two-day trial, a jury found Owen guilty of all three charges. The trial court sentenced Owen to be incarcerated for a term of not less than three years nor more than five years on each count, with the sentences to be served concurrently.

## DISCUSSION

### A. *Double Jeopardy*

■ Owen contends that he was subjected to double jeopardy when separate convictions and sentences on the three charges in this case were imposed because the charges arose out of a single incident. He claims that the indecent liberties and incest charges merged into and should have been included within the second-degree sexual assault charge. We disagree with Owen's contention that he cannot be charged with three separate offenses and with his contention that the incest conviction merges into the second-degree sexual assault conviction for purposes of punishment. We agree, however, with Owen's claim that the indecent liberties conviction merges into the second-degree sexual assault conviction for sentencing purposes.

We have repeatedly stated that the double jeopardy clause provides three protections: "[I]t prohibits a second prosecution for the same offense after an acquittal; a second prosecution for the same offense after a conviction; and multiple punishments for the same offense." *Rivera v. State*, 840 P.2d 933, 942 (Wyo.1992). We are concerned with the third protection in the case at bar.

■ We apply the statutory elements test which was defined in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), when we analyze the protection against double jeopardy in terms of multiple prosecutions and cumulative punishments. *DeSpain v. State*, 865 P.2d 584, 589 (Wyo. 1993).

We outlined the *Blockburger* test in our *DeSpain* decision:

"The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of an additional fact which the other does not."

*DeSpain*, 865 P.2d at 589 (quoting *State v. Keffer*, 860 P.2d 1118, 1130 (Wyo.1993)). We explained that this test has a two-fold purpose:

[T]he first is to determine whether the offenses have identical elements, and the second is to determine if some elements of either offense are identical to those of the other. In either instance, concerns about double jeopardy are implicated because a second prosecution and sentence for the identical crime or a second prosecution and sentence for a lesser-included crime are proscribed by the double jeopardy clauses of both our state and the federal constitutions. The essence of this test is that, when the elements or the facts of a charged offense make it separate and distinct from another charged offense, then the intention of the legislature to authorize separate or cumulative punishments for both offenses is presumed. In such an instance, the trial court can lawfully impose separate and cumulative sentences if the defendant is convicted of both crimes.

*Id.*

■ We have addressed the issue of whether the State can file multiple charges on the basis of a single act and obtain multiple verdicts from the jury on those charges. *Vigil v. State*, 563 P.2d 1344 (Wyo.1977). In *Vigil*, we held that prejudice did not attach to charging, trying, and submitting multiple offenses to the jury and receiving separate verdicts on those charges. *Id.* at 1354. We revisited this issue in *Rivera*, where we held that a defendant's right not to be placed twice in jeopardy is not violated when the defendant is convicted and punished on two counts even though he committed both acts during the same encounter. *Rivera*, 840 P.2d at 943 (citing *Baum v. State*, 745 P.2d 877 (Wyo.1987)). Separate crimes can be charged, tried, and punished under separate statutes. *Id.*

We went on to discuss the doctrine of merger of offenses for sentencing purposes:

"In deciding whether offenses merge, the question is whether the offenses charged 'necessarily involve' one another, or whether any additional facts are needed to prove additional offenses once the primary offense has been proven. In deciding merger questions, we focus not only on the similarity of the elements of the crimes, but also, and primarily, on the facts proved at trial, for the question is whether those facts show that in practical effect the defendant committed but a single criminal act.

"Additionally, we note that analysis of merger claims traditionally has revolved around the concept of injury to the sovereign; in order to support the imposition of more than one sentence, it must be found that the defendant's conduct constituted more than one injury to the Commonwealth."

840 P.2d at 944 (quoting *Commonwealth v. Whetstine*, 344 Pa.Super. 246, 496 A.2d 777, 779–80 (1985) (citations omitted)).

Owen was charged with second-degree sexual assault, indecent liberties, and incest. The applicable statutes provide in pertinent part:

(a) Any actor who inflicts sexual intrusion on a victim commits sexual assault in the second degree if, under circumstances not constituting sexual assault in the first degree:

.     .     .     .     .

(v) At the time of the commission of the act the victim is less than twelve (12) years of age and the actor is at least four (4) years older than the victim[.]

Wyo.Stat. § 6–2–303(a) (1988) (second-degree sexual assault).

(a) Any person knowingly taking immodest, immoral or indecent liberties with any child ... is guilty of a felony....

(b) As used in this section, "child" means a person under the age of eighteen (18) years.

WYO.STAT. § 14–3–105 (1994) (indecent liberties).

(a) A person is guilty of incest if he knowingly commits sexual intrusion . . . or sexual contact . . . with an ancestor or descendant or a brother or sister of the whole or half blood.

WYO.STAT. § 6–4–402(a) (Supp.1994) (incest).

(a) As used in this article:

.    .    .    .    .

(vi) "Sexual contact" means touching, with the intention of sexual arousal, gratification or abuse, of the victim's intimate parts by the actor, or of the actor's intimate parts by the victim, or of the clothing covering the immediate area of the victim's or actor's intimate parts;

(vii) "Sexual intrusion" means:

(A) Any intrusion, however slight, by any object or any part of a person's body, except the mouth, tongue or penis, into the genital or anal opening of another person's body if that sexual intrusion can reasonably be construed as being for the purposes of sexual arousal, gratification or abuse . . .

WYO.STAT. § 6–2–301(a) (1988) (definitions).

We have compared the second-degree sexual assault, indecent liberties, and incest statutes. *Kallas v. State,* 704 P.2d 693, 695 (Wyo.1985). In *Kallas,* we held the following with respect to these statutes:

All three statutes . . . concern sexual activities, but one cannot be said to be more specific than the other. The thrust of the second-degree sexual-assault statute and of the indecent-liberties-with-a-minor statute is age. They are more specific in this respect than is the incest statute. The thrust of the incest statute is family relationship. It is more specific in this respect than are the second-degree sexual-assault statute and the indecent-liberties-with-a-minor statute. There is overlap of elements among them, but the elements of the several offenses are not identical.

*Id.* Our *Rivera* decision, however, acknowledged that, for purposes of sentencing, a merger of a sexual assault offense and an indecent liberties offense may occur when the facts which have been proven at trial establish that the defendant committed only one criminal act. *Rivera,* 840 P.2d at 944; *see also Derksen v. State,* 845 P.2d 1383, 1390 (Wyo.1993).

The facts in the *Rivera* case with regard to one of Rivera's victims, when they are examined for the purpose of making a merger analysis, are very similar to the facts in the case at bar. The victim awoke to discover that Rivera was on top of her and had penetrated her vagina with his penis. *Rivera,* 840 P.2d at 943. In order to accomplish the sexual assault, Rivera pulled her jeans and panties down past her knees. *Id.* We held that, given those facts, the pulling down of the victim's clothes "was a part of, and necessary to, the accomplishment of the sexual assault. The penetration could not have been accomplished without removal of [the victim's] clothing." *Id.* We also held that, although the State was entitled to charge Rivera with first-degree sexual assault and indecent liberties with a minor and to have those charges presented to the jury, the indecent liberties conviction merged into the first-degree sexual assault conviction for the purpose of punishment. 840 P.2d at 944.

In the present case, the State alleged in its bill of particulars that, as to the second-degree sexual assault charge, Owen had inflicted sexual intrusion on his daughter by inserting one of his fingers into her vagina. With respect to the incest charge, the State alleged that Owen had inflicted sexual intrusion or sexual contact upon his daughter by inserting one of his fingers into her vagina and by touching her in the area of her vagina. Regarding the indecent liberties charge, the State alleged that Owen had pulled down his daughter's panties, had touched her in the area of her vagina, and had inserted one of his fingers into her vagina.

Consistent with our *Rivera* decision, we conclude that the pulling down of Owen's daughter's panties and the touching of her in the area of her vagina were a part of, and necessary to, the accomplishment of the second-degree sexual assault. The penetration could not have been otherwise accomplished. The incident resulted in only one sexual intrusion, and, therefore, the indecent liberties

conviction merged into the sexual assault conviction for sentencing purposes. The incest statute requires that the sexual contact or intrusion be committed upon a relative of the accused. This family relationship element prevents the incest conviction from merging into the second-degree sexual assault conviction since a family relationship was not a necessary element for the sexual assault. Furthermore, when the abuser is the victim's father, the victim suffers a unique emotional injury in addition to enduring the physical sexual intrusion.

The crimes at issue are separate and distinct offenses, and the State was entitled to charge Owen with all three crimes and to have them be presented to the jury. Once Owen had been convicted of all three charges, however, the indecent liberties conviction merged into the second-degree sexual assault conviction for purposes of punishment, and a sentence for the indecent liberties conviction should not have been imposed.

## B. *Hearsay Statements*

■ Owen maintains that the admission of the hearsay statements made by the victim to a physician and a therapist deprived him of his constitutional right to confront the witnesses against him. The State argues that the statements were properly admitted under the hearsay exception which allows statements to be admitted which were made for the purposes of medical diagnosis or treatment. We agree with the State.

Hearsay is defined as follows:

(c) *Hearsay.*—"Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

W.R.E. 801(c). Although hearsay evidence is ordinarily inadmissible, it may be received into evidence when it falls within one of the exceptions to the hearsay rule. *Betzle v. State,* 847 P.2d 1010, 1015 (Wyo.1993).

In *Betzle,* we held that the trial court properly admitted the testimony from a professional counselor and a pediatrician with regard to the statements which the victim had made to them and which they had relied upon in connection with their diagnoses and treatments. We explained:

A statement made in the course of procuring medical services, when the declarant presumably knows that a false statement may cause misdiagnosis or mistreatment, carries special guarantees of credibility that a trier of fact may not think can be replicated by testimony in the context of the courtroom. Where the proffered hearsay has those sufficient guarantees of reliability to bring it within a firmly-rooted exception to the hearsay rule, the confrontation clause of the Constitution is satisfied. The policy justification for admissibility is that the confrontation clause of the Constitution has as its basic purpose the promotion of the integrity of the fact-finding process. Consequently, the exclusion of probative statements such as these under the strictures of the confrontation clause would be antithetical to this fundamental purpose of the Constitution.

847 P.2d at 1020 (citations omitted). We further noted:

Public policy justifies a more liberal approach that should prevail in cases such as this because, although the child may be too young to know what is actually germane to his or her treatment, still the child has no reason to fabricate and, presumably, furnishes the physician a full account of the occurrence, simply as a part of the story of the injury. Lloyd Leva Plaine, Comment, *Evidentiary Problems in Criminal Child Abuse Prosecutions,* 63 Geo. L.J. 257 (1974).

847 P.2d at 1020–21.

After receiving argument from both counsel, the trial court admitted the statements pursuant to W.R.E. 803(4). That rule provides:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

.            .            .            .            .

(4) *Statements for purposes of medical diagnosis or treatment.*—Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain,

or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment[.]

Wyoming precedent supports the trial court's ruling. In *Betzle,* we held that an expert witness may testify under W.R.E. 803(4) with regard to what was said to the witness by an abused child, provided that "(1) the expert's testimony shows the victim's statements were consistent with the purposes for which the witness became involved with the victim, and [that] (2) the witness relied on the statements in connection with diagnosis and treatment of the victim." 847 P.2d at 1017. *See also Stephens v. State,* 774 P.2d 60, 72 (Wyo.1989).

These elements were satisfied in the case at bar. After the State laid the proper foundation, the physician testified that he had met with the victim to determine whether she had been sexually abused. · During his testimony, the physician explained his physical findings and mental impressions with respect to the victim. He also indicated that he had relied on the statements made by the victim in connection with his diagnosis and treatment. He specifically testified as follows:

Q. Doctor, on your initial contact with any of your patients do you take any kind of medical history information from them?

A. Yes.

   .    .    .    .    .

Q. What is the purpose of taking this information?

A. The history focuses your attention on a certain organ system or area of the body that is the concern, helps you gain information pointing toward one diagnosis or another and helps channel, if you will, the physical examination.

Q. Do you take this from the patient[s] themselves?

A. Yes.

Q. When you're called upon to examine people who have reportedly been sexually abused, do you do the same thing?

A. Yes.

   .    .    .    .    .

Q. Okay, now when [the victim] came into your office, did you take a medical history from her, or a history of complaints?

A. Yes.

Q. And in the course of doing that, did you ask her questions and she give you answers?

A. Yes.

Q. And was that, as you previously stated, for the purpose of determining what to look for of diagnosis and treatment, as it were?

A. Yes.

Q. And what did you ask of [the victim]?

A. Well, she—I asked her what happened and she said that her father had touched her.

   .    .    .    .    .

... I asked her what her father had done.

Q. ... Did she respond to you?

A. She said he put her finger in her vagina and her rectum—put his finger in her vagina and her rectum.

Q. Did you ask her any further questions?

A. I asked her directly, did he put his finger where you pee. Now children do not distinguish between the urethra opening for urine and vaginal opening. She said yes. I asked her, did he put his finger where you poop, and she said yes.

Q. When she originally told you, did she use the word vagina?

A. I used those words.

Q. Do you remember what words she may have used?

A. She said yes, and that is when I asked her the direct questions.

Q. Doctor, did you then conduct a physical examination of [the victim]?

A. Yes, I did.

   .    .    .    .    .

Q. ... What parts of her body did you examine, doctor?

A. I examined, essentially, her lower abdomen and the external genitals and the rectal area.

The therapist also examined the victim. She testified that she had conducted an interview with the victim in an effort to determine whether the victim had been sexually abused. Her testimony, which was given after the proper foundation had been laid, indicated that the purpose of the interview was to make a diagnosis and establish a treatment in the event that one was indicated. She said that she had relied upon the victim's statements in connection with the diagnosis and potential treatment of the victim. Her testimony, in pertinent part, was as follows:

Q. ... [A]re you acquainted with [the victim]?

A. Yes, I am.

Q. Do you have a professional relationship with [the victim] at this time?

A. Yes, I am her counselor.

  ·  ·  ·  ·  ·

Q. How did it occur that you had occasion to meet with [the victim]?

A. [She] had reportedly been sexually abused and her mother contacted our agency to set up an appointment for therapy.

Q. When you first met with [her], what did you do?

A. The first session is an intake session. During that time we gather background information and history and a summary of the presenting problems.

Q. Do you do that in every case?

A. Yes, I do.

Q. And is this done by questioning by yourself and answering by the patient that you're visiting with at the time?

A. Yes.

Q. And did you do that in [the victim's] case specifically?

A. Yes, I did.

Q. And what is the purpose of doing the intake history, if you will?

A. It's necessary to gather the information to determine a diagnosis and then to establish a treatment plan.

  ·  ·  ·  ·  ·

Q. Is that the purpose you did it in the case of [the victim]?

A. Yes, it is.

Q. Is that an important function of what you do as a counselor?

A. That is an essential function.

Q. At the time that you met with [the victim], did you ask her any questions?

A. I asked [her] if she could tell me what may have happened to her, if anything happened to her.

Q. And did she respond to you?

A. Yes, she did.

Q. What did she say to you?

A. At that time [she] told me that her daddy had inserted his finger into her vagina and that it had hurt; that she had asked him to stop and she was crying and that he did not stop and that he had his hand between her legs.

Q. Did she use the word vagina?

A. No, she didn't use that word. She used the word her front private.

Q. Did [she] then show you what she meant or explain to you what she meant by her front private?

A. Yes, she indicated it was in her genital area.

Owen was not denied his constitutional right to confront the witnesses against him. The statements at issue possessed the required guarantees of reliability to bring them within the firmly rooted exception to the hearsay rule. The trial court, therefore, properly admitted the statements into evidence.

### C. *Effective Assistance of Counsel*

Owen claims that his trial counsel's deficient performance deprived him of his state and federal constitutional rights to have effective assistance of counsel. Specifically, Owen insists that his trial attorney's representation was inadequate for the following reasons: He failed to conduct meaningful

cross-examinations of the children, the mother, and the expert witnesses; he did not object to the prosecutor's use of leading questions; and he did not object when the prosecutor misstated the evidence during his closing argument. The State argues that Owen has neither demonstrated that his counsel's performance was deficient nor shown that the deficient performance resulted in prejudice to his defense. We agree with the State.

"The right of a criminal defendant to assistance of counsel is guaranteed by the Sixth Amendment of the Constitution of the United States, made applicable to the states through the Fourteenth Amendment and Wyoming Constitution Art. 1, § 10." *Herdt v. State,* 891 P.2d 793, 796 (Wyo.1995).

The standard which this Court has followed in determining whether a criminal defendant has been denied the effective assistance of counsel was first articulated in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

"First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, *reh'g denied,* 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984).

. . . .

We examine the conduct of defense counsel in light of all the circumstances in determining whether the identified acts or omissions fall outside the ambit of professionally competent assistance, bearing in mind the function of counsel is to make the adversarial testing process work in every case. We do not evaluate the efforts of counsel from a perspective of hindsight but, rather, we endeavor to reconstruct the circumstances surrounding counsel's challenged conduct and evaluate the professional efforts from the perspective of counsel at the time. "We invoke a strong presumption that counsel rendered adequate and reasonable assistance making all decisions within the bounds of reasonable professional judgment." *Gist [v. State],* 737 P.2d [336,] 342 [ (Wyo.1987) ] (citations omitted). The burden is upon the defendant to overcome this presumption that, in light of the circumstances, the challenged action or failure of the attorney might be considered sound trial strategy.

*Dickeson v. State,* 843 P.2d 606, 609 (Wyo. 1992) (some citations omitted).

Owen contends that he was denied effective assistance of counsel when his trial attorney declined the opportunity to conduct vigorous cross-examinations of many of the State's witnesses. At trial, Owen's attorney made the tactical decision not to cross-examine the two children. The record illustrates that the children were having some difficulty testifying and did not describe the details which pertained to the incident at the core of this case. During his opening statement, which he gave after the close of the State's evidence, the defense counsel said: "[Y]ou notice I didn't ask any questions of the children. I'm not going to pound on them or ask questions of them. How stupid that would be."

The State pointed out in its brief that two dangers existed in cross-examining the children: First, any vigorous cross-examination might have alienated the jury by causing it to be sympathetic toward the children; second, a vigorous cross-examination might have resulted in eliciting details adverse to Owen which the prosecutor had been unsuccessful in bringing out in his direct examination. We agree that these concerns were legitimate and justified the trial counsel's decision.

Owen finds fault with the manner in which his trial counsel conducted his cross-examinations of the children's mother, the physician, and the therapist, and he recom-

mends various lines of questioning that his trial counsel should have pursued. We surmise that Owen's recommendations stem from the operation of 20/20 hindsight. We will not evaluate the trial counsel's efforts from a hindsight perspective. We attempt to reconstruct the circumstances which existed during the trial counsel's challenged conduct and evaluate the performance from his perspective. A close review of the record reveals that the trial attorney's cross-examinations were relevant and useful to the theory which the defense was pursuing.

 Owen claims that his attorney's failure to object to the prosecutor's use of leading questions constitutes ineffective representation. Given the young age of the children and their apparent anxiety about being on the witness stand, the trial court likely would have allowed the prosecution to ask leading questions, even in the face of an objection from the defense. Many attorneys subscribe to the theory that objections should be used sparingly in order to avoid alienating the jury. We conclude that the defense counsel's decision not to object to the various leading questions which the prosecutor posed was a reasonable decision on his part.

Owen maintains that his trial counsel should have objected during closing arguments when the prosecutor stated that the victim's brother had testified that he saw his father "penetrate," rather than "touch," the victim with his finger. We do not believe that the jury was misled or confused by the prosecutor's statement such that it prejudiced the defense's case.

The second prong of the *Strickland* test requires the defendant to show that his attorney's deficient performance prejudiced his defense. The defendant must show that his attorney's errors were serious enough to deprive him of a fair trial. Owen's trial counsel utilized the "scorned woman seeking revenge" strategy and produced several witnesses in an attempt to bolster this theory. After reviewing the record in its entirety, we conclude that Owen's trial counsel was quite effective in presenting Owen's defense to the jury. The fact that this strategy was ultimately unsuccessful does not require a holding of ineffective assistance of counsel. Owen's defense counsel did not perform deficiently; therefore, Owen was not prejudiced by the manner in which his trial attorney conducted his case.

## CONCLUSION

We hold that the indecent liberties conviction merged into the second-degree sexual assault conviction for purposes of punishment and that the sentences which were imposed for the incest and second-degree sexual assault convictions were proper. We do not find any reversible error in the remaining issues which were raised by Owen; therefore, the judgment and sentence is

Affirmed as modified.