# IN THE SUPREME COURT, STATE OF WYOMING

## 2013 WY 98

APRIL TERM, A.D. 2013

*August 14, 2013*

IVAN LEE SWEETS, SR.,

Appellant
(Defendant),

v.

S-12-0253

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Sweetwater County*
*The Honorable Nena James, Judge*

*Representing Appellant:*

Diane Lozano, State Public Defender; Tina N. Olson, Chief Appellate Counsel; David E. Westling, Senior Assistant Appellate Counsel; Wyoming Public Defender Program. Argument by Mr. Westling.

*Representing Appellee:*

Gregory A. Phillips, Wyoming Attorney General; David L. Delicath, Deputy Attorney General; Theodore R. Racines, Senior Assistant Attorney General; Darrell D. Jackson, Prosecution Assistance Program; and Emily Thomas, Student Director; Rives White, Student Intern. Argument by Messers. Racines and White.

*Before KITE, C.J., and HILL, VOIGT, BURKE, and DAVIS, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**HILL,** Justice.

[¶1]    Ivan Sweets was convicted of one count of obtaining property by false pretenses and one count of wrongful disposing of that property.  He was sentenced to terms of six to eight years on each count, to be served consecutively.  On appeal, Sweets challenges the sufficiency of the evidence to support his conviction for obtaining property by false pretenses, and he contends that the two criminal counts should have merged for purposes of sentencing.

[¶2]    We affirm and, in so ruling, we overrule the "same facts or evidence test" for evaluating sentencing merger questions.  The same elements test shall henceforth serve as our sole test for evaluating merger questions.[1]

### ISSUES

[¶3]    Sweets states the issues on appeal as follows:

> I.    Did the court err by denying [Sweets'] motion for judgment of acquittal for the reason that there was insufficient evidence to support a verdict on obtaining property by false pretenses?
>
> II.    Did the court err in denying [Sweets'] motion to merge sentences in that both convictions arose from a single act and a single set of facts?

### FACTS

[¶4]    In April 2010, Sweets approached Mary Froman at her residence in Rock Springs, Wyoming and offered to clean up her property by removing junk iron and parts that he could sell for scrap.  Ms. Froman agreed and showed Sweets the items that she would permit him to remove from her property.  Ms. Froman also showed Sweets the items that she did not want removed from her property and that she did not consider junk that could be scrapped.  Among the items Ms. Froman told Sweets she did not want removed were the attachments to a crane that was parked on her property, including the crane's boom, buckets, and dolly.

---

[1] *See Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932) (setting forth same elements test); *see also James v. State*, 2012 WY 35, ¶ 22, 271 P.3d 1016, 1022 (Wyo. 2012) (Voigt, J., specially concurring and urging abandonment of same facts or evidence test and return to elements test only); *Winstead v. State*, 2011 WY 137, ¶ 16, 261 P.3d 743, 746 (Wyo. 2011) (Voigt, J., specially concurring); *Baker v. State*, 2011 WY 123, ¶ 23, 260 P.3d 268, 274 (Wyo. 2011) (Voigt, J., specially concurring); and *Najera v. State*, 2009 WY 105, ¶ 17, 214 P.3d 990, 995 (Wyo. 2009) (Voigt, C.J., specially concurring).

1

[¶5]    About a month later, in May 2010, Sweets again contacted Ms. Froman, this time to tell her that he had located a buyer for her crane.  Ms. Froman testified as follows concerning the conversation:

> A.      He asked if he could talk to me about the crane and I said yes, what is going on.  And he said I have a buyer for your crane.  And I said, oh, okay.  And he said this buyer is from Pinedale, he wants your crane, but he doesn't want any of the boom, buckets or any of this other stuff, he just wants the crane.  I told him at this time what he could do is he could tell the person that I was willing to sell the crane.  I told him the price.  But I said, the boom, bucket, all of this goes with the crane.  If he don't want that he has to deal with you, not with me.  He has it, he has it, it's lock, stock and barrel, he takes the crane and all the parts.  I just didn't want to deal with a whole bunch of people with different things going on.  The crane was $30,000 for the boom, buckets, crane and attachments.
> Q.      So it was a package deal?
> A.      Right.
> Q.      He talked about a buyer from Pinedale.  Did he ever tell you who that was?
> A.      No.
> Q.      Did he ever – did you ever talk to anyone from Pinedale?
> A.      No.

[¶6]    Sometime after that conversation, between the months of June and September 2010, Sweets asked Ms. Froman if he could purchase the crane himself.  Ms. Froman responded by offering Sweets the same package deal–$30,000 for the crane and its attachments.  Sweets and Ms. Froman had continuing conversations, and during one of those conversations, Ms. Froman agreed to finance the $30,000 purchase price.

> Q.      Were there certain things that you told him he would need to do in order for you to agree to finance the crane?
> A.      Yes, I did.
> Q.      What were those things?
> A.      That he had to have insurance on it.  He had to have the crane in running condition.  He had to keep it up.  He had to stay in – all of the regulations and everything that went on with the state as far as permits, fees, everything, he

2

had to do, he had to get all of these gathered around. He had to have a good mechanic. He had to have a place to put it while he worked on it because my driveway was not going to be open to him having a bunch of stuff around there working on the crane. He had to have a place to work on it. He had to move it to that place, so he had to have enough money to get permits to even move it after he –

Q. Was there a contract that was written at some point regarding you financing the crane for him?

A. I wrote a contract with him that stated that if he wanted to buy this crane, it was a 45-ton crane, it was with 510 foot of boom, it was four buckets, a dolly and some jib. If he wanted to take this crane and he wanted to keep it in good shape and work on it, I would work with him and go over a three-year period of financing to $30,000 for him.

[¶7]  Sometime later, Sweets told Froman that he had made the arrangements she had requested and had secured: an individual willing to assist him in financing the costs of insurance (James Reinard); a mechanic to help Sweets work on the crane (Randy Shipman); and an auto recycling operation owner who would allow Sweets to store and work on the crane on his property (Jim Rasmussen). Ms. Froman did not know James Reinard, but she knew and trusted Randy Shipman and Jim Rasmussen, and she instructed Sweets to set up a meeting with each of the individuals so she could verify their arrangements with Sweets. The meetings Ms. Froman requested did not occur, and the contract remained unexecuted.

[¶8]  In October 2010, Sweets again contacted Ms. Froman, and this time he requested permission to move the crane and its attachments to Jim Rasmussen's business property, 5 Star Auto and Truck Recycling. Ms. Froman testified as follows concerning that conversation:

A. Well, he came to me and said that he had someone that could move the crane up to 5 Star and that he was supposed to clean up their yard in exchange for the trucking of my boom and buckets and everything up to 5 Star.

Q. Was there a time that you told him that it would be okay to take the items up to 5 Star?

A. Only when he – he called me – after I said I had told him I wasn't going to let anything go until we get this contract signed and everything, he came to me, he called me and said the trucking company that is going to move that up there has a contract. They are going to be busy and it/s getting cold. It's getting winter, it's going to be hard to travel

3

and everything, can I move the boom and buckets and crane up there now. And I told him no, not until you get this signed, not until we have an agreement on this. And he said, but can I just move the boom and buckets for now and get them on pallets out of the mud and everything. So I told him yes, the boom and the buckets could go up there to 5 Star on a pallet, but the crane was not to go until the contract and everything – until he had all his people going. I didn't feel like the boom and buckets could be worked anywhere else expect (sic) on the crane and the crane was stationary in my yard, I could see it. So I thought it was okay to let the boom and buckets be at this place where he was going to start a business.

[¶9] On October 13, 2010, Sweets arrived at Ms. Froman's property followed by a truck owned by Legend Trucking. At Sweets' direction, the truck driver loaded the crane's boom and jib. There were several other crane attachments that Sweets wanted taken at the same time, but those items would not fit on the truck with the boom and jib. Legend Trucking did not deliver the crane attachments to 5 Star for storage, but instead delivered the items to Pacific Steel, a steel recycling operation, where the items were sold for scrap. Leonard Bartels, the driver, testified:

> A. I took it down to Pacific Steel and weighed in again, like I normally do. They told me to go get it unloaded, went down and got it unloaded. And come back up on the scales and got out of the truck. And Ivan [Sweets] was there and he said I have got it taken care of, and I said all right, I'll talk to you later. And that was it.
> Q. So Ivan followed you down to Pacific Steel?
> A. Yes.
> Q. How did you know to take those items to Pacific Steel?
> A. Because he told me to.

[¶10] On December 15, 2010, Ms. Froman called Jim Rasmussen to check on the boom and jib and make sure they were not in his way or in a bad place for him. Mr. Rasmussen informed Ms. Froman that none of her crane parts were being stored in his lot, and Ms. Froman immediately contacted the Sweetwater County Sheriff's Office. Sweets did not pay Ms. Froman for the crane parts, and after Ms. Froman discovered that the crane parts were not delivered to the 5 Star lot for storage, she did not again permit Sweets on her property.

4

[¶11] In July 2011, the State filed an Information charging Sweets with one count of wrongful taking or disposing of property and one count of obtaining property by false pretenses. A jury trial was held on January 9-11 and 19-20, 2012. On January 20, 2012, the jury returned a verdict finding Sweets guilty on both counts. On January 31, 2012, Sweets filed a Motion for Judgment of Acquittal and a New Trial, which the district court denied from the bench. On February 10, 2012, Sweets filed a Motion for Merger of Sentences, which the court also denied.

[¶12] On April 11, 2012, the court held a sentencing hearing for the purposes of sentencing Sweets on the two counts at issue in this appeal, as well as on a separate delivery of methamphetamine count. The court sentenced Sweets to six to eight years on each of the two counts at issue in this appeal, to run consecutively. Sweets filed this timely appeal.

## DISCUSSION

### A.    Sufficiency of the Evidence

[¶13] Sweets contends that the evidence at trial was insufficient to support a conviction for obtaining property by false pretenses because the evidence shows nothing more than a commercial dispute. Sweets asserts that the promises on which Ms. Froman relied were promises to perform acts in the future, namely his promise to execute a contract to purchase the crane and his promise to make payments on that contract, and he argues, such promises of future performance cannot support a false pretenses conviction. We disagree with Sweets' characterization of the evidence and conclude that the evidence was sufficient to support his conviction for obtaining property by false pretenses.

[¶14] In reviewing a sufficiency of the evidence claim,

> we examine and accept as true the State's evidence and all reasonable inferences which can be drawn from it. We do not consider conflicting evidence presented by the defendant. We do not substitute our judgment for that of the jury; rather, we determine whether a jury could have reasonably concluded each of the elements of the crime was proven beyond a reasonable doubt. This standard applies whether the supporting evidence is direct or circumstantial.

*Craft v. State*, 2013 WY 41, ¶ 18, 298 P.3d 825, 830-31 (Wyo. 2013) (quoting *Dawes v. State*, 2010 WY 113, ¶ 17, 236 P.3d 303, 307 (Wyo. 2010) (citations omitted)).

[¶15] A person who knowingly obtains property from another person by false pretenses with the intent to defraud that person is guilty of a felony if the value of the property is

5

one thousand dollars or more. Wyo. Stat. Ann. § 6-3-407(a)(i) (LexisNexis 2013). The parties stipulated below that the value of the crane attachments at issue was in excess of one thousand dollars. As to the remaining elements, we have held that to prove a violation of § 6-3-407(a), the State must prove: "(1) the pretenses; (2) their falsity; (3) the fact of obtaining property by reason of the pretenses; (4) the knowledge of the accused of their falsity; and (5) the intent to defraud." *Lopez v. State*, 788 P.2d 1150, 1152 (Wyo. 1990). "Intent to defraud is an essential element of the crime of obtaining property by false pretenses that may be inferred from the defendant's conduct and circumstantial evidence." *Trevino v. State*, 2006 WY 113, ¶ 12, 142 P.3d 214, 218 (Wyo. 2006).

[¶16] To the extent that the alleged false pretenses relate to a promise of future acts, this Court has further said:

> Specific intent is an essential element of the crime of obtaining property by false pretenses in Wyoming. In order to succeed in a prosecution for a promise to perform future acts, the State is required to prove that a defendant had the intent not to perform a promise as well as the falsity of the promises/pretenses, that property was obtained by reason of the pretenses, and the knowledge of the accused of their falsity.

*Craver v. State*, 942 P.2d 1110, 1113-14 (Wyo. 1997) (citing *Lopez*, 788 P.2d at 1152; *Miller v. State*, 732 P.2d 1054, 1063-64 (Wyo. 1987)).

[¶17] Sweets was convicted of obtaining Ms. Froman's crane attachments by false pretenses. In evaluating the State's evidence that supports this conviction, we disagree with Sweets that the focus is or should be on whether he ultimately intended to execute the $30,000 crane purchase agreement. Instead, our focus is on the representations Sweets made to induce Ms. Froman to release the crane attachments to him. Regarding those representations, the State's evidence, which we accept as true, was as follows:

--Ms. Froman testified that Sweets told her that he had lined up three individuals, James Reinard, Randy Shipman, and Jim Rasmussen, to assist him with repairs to the crane and its attachments by providing financing to assist in the cost of insurance and repairs, mechanical assistance with the repairs themselves, and a location to store the crane and its attachments during those repairs;

--James Reinard, Randy Shipman, and Jim Rasmussen each testified that no such arrangements had been made;

--In particular, Jim Rasmussen, owner of 5 Star Auto and Truck Recycling, testified that Sweets had never discussed with him the possibility of storing the crane

6

attachments on his property or storing the crane on his property while it was being repaired;

    --Ms. Froman testified that Sweets told her that he if she allowed him to take the crane attachments, he would move them to 5 Star to be stored and protected from the elements;

    --Ms. Froman testified that she agreed to allow Sweets to take the crane attachments because she believed he was moving them to the 5 Star property for storage; and

    --Leonard Bartels, the driver who picked up the crane attachments, testified that after he loaded the crane attachments on his truck, he immediately delivered them to Pacific Steel in accordance with Sweets' instructions.

[¶18] The State's evidence was sufficient to allow the jury to conclude that Sweets misrepresented both existing facts as well as his intended future performance, and that he intended by those false pretenses to defraud Ms. Froman and obtain her property. The evidence showed that Sweets represented to Ms. Froman that he was going to move her property to a better protected location for storage and that she relied on that promise in allowing him to take her property. The evidence further showed that Sweets had not secured a more protected location to store the property and that Sweets instead directed that the property be immediately transported to Pacific Steel where he sold the property for its scrap value. From this evidence, the jury could certainly infer Sweets' intent to defraud Ms. Froman, and we thus reject Sweets' sufficiency of the evidence challenge to his false pretenses conviction.

## B.    Sentencing Merger

[¶19] Sweets contends that the district court erred in denying his motion to merge the sentences for his convictions for obtaining property by false pretenses and wrongful disposing of property. We recognize that protection against multiple punishments for the same offense is a protection afforded by both state and federal double jeopardy provisions. *James v. State*, 2012 WY 35, ¶ 12, 271 P.3d 1016, 1018 (Wyo. 2012). Because sentencing merger presents a constitutional question, we review the issue as follows:

> This Court reviews *de novo* the question of whether a defendant's constitutional protection against double jeopardy has been violated. *Daniel v. State*, 2008 WY 87, ¶ 7, 189 P.3d 859, 862 (Wyo. 2008). We consider protections provided by the fifth amendment to the United States Constitution and by

7

art. 1, § 11 of the Wyoming Constitution to be equivalent. *Id.*, ¶ 8, 189 P.3d at 862.

*James*, ¶ 9, 271 P.3d at 1018.

## 1.      Overview of Merger Analysis

[¶20]  The double jeopardy clauses of the United States and Wyoming constitutions afford three distinct protections:  "1) [P]rotection against a second prosecution for the same offense following an acquittal; 2) protection against a second prosecution for the same offense after a conviction; and 3) protection against multiple punishments for the same offense." *James*, ¶ 12, 271 P.3d at 1018 (quoting *Meyers v. State*, 2005 WY 163, ¶ 9, 124 P.3d 710, 714 (Wyo. 2005)).  We are concerned in this case with the third protection, that being the protection against multiple punishments for the same offense.

[¶21]  With respect to the double jeopardy protection against multiple punishments, the United States Supreme Court has held that the key inquiry is whether the legislative branch intended the defendant's conduct to result in separate offenses and separate punishments—and if the legislature did so intend, then there is no double jeopardy violation.

> In contrast to the double jeopardy protection against multiple trials, the final component of double jeopardy—protection against cumulative punishments—is designed to ensure that the sentencing discretion of courts is confined to the limits established by the legislature. Because the substantive power to prescribe crimes and determine punishments is vested with the legislature, *United States v. Wiltberger*, 5 Wheat. 76, 93, 5 L.Ed. 37 (1820), the question under the Double Jeopardy Clause whether punishments are "multiple" is essentially one of legislative intent, see *Missouri v. Hunter*, 459 U.S. 359, 366–368, 103 S.Ct. 673, 678–679, 74 L.Ed. 2d 535 (1983).

*Ohio v. Johnson*, 467 U.S. 493, 499, 104 S.Ct. 2536, 2540-41, 81 L.Ed. 2d 425 (1984) (footnote omitted).

[¶22]  One commentator has summarized the protection against multiple punishments and the Supreme Court's approach to determining the constitutionality of multiple punishments as follows:

> The Double Jeopardy Clause does not limit legislative authority to define punishment.  In the case of related convictions, a legislature can fix the sentence or sentencing

range, provided only that it falls within the broad range permitted by the constitutional prohibition on cruel and unusual punishment and the due process requirement of fundamental fairness. Therefore, in evaluating a defendant's multiple punishment claim, the focus is legitimately, inevitably, and almost exclusively on legislative intent. The only question is whether the punishment exceeds that intended by the legislature.

Anne B. Poulin, Article: *Double Jeopardy and Multiple Punishment: Cutting the Gordian Knot*, 77 U. Colo. L. Rev. 595, 597 (2006) (footnotes omitted); *see also Albernaz v. United States*, 450 U.S. 333, 344, 101 S.Ct. 1137, 1145, 67 L.Ed. 2d 275 (1981) ("[T]he question of what punishments are constitutionally permissible is not different from the question of what punishments the Legislative Branch intended to be imposed."); *Whalen v. United States*, 445 U.S. 684, 689, 100 S.Ct. 1432, 1436, 63 L.Ed.2d 715 (1980) (acknowledging that power to define criminal offenses and prescribe punishment "resides wholly" in the legislative branch); *Brown v. Ohio*, 432 U.S. 161, 165, 97 S.Ct. 2221, 2225, 53 L.Ed. 2d 187 (1977) ("Where consecutive sentences are imposed at a single criminal trial, the role of the constitutional guarantee is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments[.]").

[¶23]  Consistent with this focus on the legislature's power to define what constitutes a separate criminal offense and authorize separate punishment for separate offenses, the United States Supreme Court has adopted the following analytical framework  for determining whether a defendant has been subjected to multiple punishments in violation of double jeopardy protections:

> A single act may be an offense against two statutes; and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other.

*Blockburger*, 284 U.S. at 304, 52 S.Ct. at 182 (citations omitted).

[¶24]  The *Blockburger* analysis has become known as the "same elements test," and it is essentially a test aimed at determining legislative intent.

> The test articulated in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), serves a  generally similar function of identifying congressional intent to impose separate sanctions for multiple offenses arising in the course

of a single act or transaction. In determining whether separate punishment might be imposed, *Blockburger* requires that courts examine the offenses to ascertain 'whether each provision requires proof of a fact which the other does not.' *Id.*, at 304, 52 S.Ct., at 182. As *Blockburger* and other decisions applying its principle reveal … the Court's application of the test focuses on the statutory elements of the offense. If each requires proof of a fact that the other does not, the *Blockburger* test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes.

*Albernez*, 450 U.S. at 337-38, 101 S.Ct. at 1141-42 (quoting *Iannelli v. United States*, 420 U.S. 770, 785, n.17, 95 S.Ct. 1284, 1293, n.17, 43 L.Ed. 2d 616 (1975)); *see also Whalen*, 445 U.S. at 691-92, 100 S.Ct. at 1437-38 (*Blockburger* same elements test as rule of statutory construction to determine legislative intent).

[¶25] Our Court has likewise long applied the *Blockburger* same elements test for determining whether convictions should merge for sentencing. *See, e.g., James*, ¶ 12, 271 P.3d at 1018; *Howard v. State*, 762 P.2d 28, 32 (Wyo. 1988). We have stated:

Federal double jeopardy law appears to have been settled in *United States v. Dixon*, 509 U.S. 688, 696, 113 S.Ct. 2849, 2856, 125 L.Ed. 2d 556 (1993), with the Supreme Court's holding that "[i]n both the multiple punishment and multiple prosecution contexts, this Court has concluded that where the two offenses for which the defendant is punished or tried cannot survive the 'same-elements' test, the double jeopardy bar applies." The inquiry under the same-elements test is "whether each offense contains an element not contained in the other; if not, they are the 'same offence' and double jeopardy bars additional punishment and successive prosecution." *Id.* Like the United States Supreme Court, this Court recognizes and follows the same-elements test. *See, e.g., Granzer v. State*, 2010 WY 130, ¶ 13, 239 P.3d 640, 645 (Wyo. 2010); *Snow v. State*, 2009 WY 117, ¶ 16, 216 P.3d 505, 510 (Wyo. 2009); and *Najera v. State*, 2009 WY 105, ¶ 11, 214 P.3d 990, 994 (Wyo. 2009).

*James*, ¶ 12, 271 P.3d at 1018 (quoting *Rathbun v. State*, 2011 WY 116, ¶ 6, 257 P.3d 29, 32 (Wyo. 2011)).

[¶26] This Court has not, however, limited its analysis of sentencing merger questions to application of the same elements test. For some time, we have required an additional inquiry into the facts proven at trial, an analysis we shall refer to in this opinion as the facts or evidence test.

> In addition to the same-elements test, this Court has also considered a merger doctrine that allows for the consideration of other factors:
>
>> The question of merger as a bar to multiple sentences for the same act, however, summons a more complex appellate standard of review. As a practical matter, in appeals alleging imposition of multiple sentences for a single act, the focus necessarily expands to embrace those facts proven at trial. The ultimate question becomes whether those facts reveal a single criminal act or multiple and distinct offenses against the victim or victims and hence the State.

*James*, ¶ 13, 271 P.3d at 1019 (quoting *Bilderback v. State*, 13 P.3d 249, 254 (Wyo. 2000)); *see also Winstead*, ¶ 14, 261 P.3d at 746; *Najera*, ¶ 11, 214 P.3d at 994; *Rouse v. State*, 966 P.2d 967, 970 (Wyo. 1998); *Owen v. State*, 902 P.2d 190, 193 (Wyo. 1995); *Rivera v. State*, 840 P.2d 933, 944 (Wyo. 1992).

[¶27] The facts or evidence test requires the following additional analysis to determine whether convictions should merge for sentencing:

> In deciding whether offenses merge, the question is whether the offenses charged "necessarily involve" one another, or whether any additional facts are needed to prove additional offenses once the primary offense has been proven. In deciding merger questions, we focus not only on the similarity of the elements of the crimes, but also, and primarily, on the facts proved at trial, for the question is whether those facts show that in practical effect the defendant committed but a single criminal act.

*Bilderback*, 13 P.3d at 255 (quoting *Commonwealth v. Whetstine*, 496 A.2d 777, 779-80 (Pa. Super. 1985)).

[¶28] Having set forth the general framework for our merger analysis, we next apply the two merger tests, the same elements test and the facts or evidence test, to the offenses for which Sweets was convicted and sentenced in this case.

11

## 2.    Application of Same Elements Test

[¶29]  On appeal, Sweets does not appear to contest the district court's conclusion that merger of his sentences was not required under the same elements test.  Instead, he argues that the court erred in not finding that application of the facts or evidence test required a merger.  Nonetheless, in the interests of providing a complete analysis, we address the same elements test.  In doing so, we conclude that the crimes of obtaining property by false pretenses and of wrongful disposing of property have different elements and that the legislature intended separate criminal offenses with separate sentences for each offense.

[¶30]  Again, our inquiry under the same elements test is whether each criminal offense contains an element not contained in the other.  *James*, ¶ 12, 271 P.3d at 1018.  The jury instructions given below set forth the elements of each criminal offense with which Sweets was charged.  Instruction No. 12 defined the elements of obtaining property by false pretenses:

> 1.    On or between the 1st day of October, 2010, and the 15th day of December, 2010,
> 2.    In Sweetwater County, Wyoming,
> 3.    The Defendant, Ivan Lee Sweets, Sr.,
> 4.    With intent to defraud Mary Froman,
> 5.    Knowingly obtained crane parts from Mary Froman,
> 6.    By false pretenses, and
> 7.    The value of the property obtained was $1,000.00 or more.

[¶31]  Instruction No. 13 defined the elements of wrongful disposing of property:

> 1.    On or between the 1st day of October, 2010, and the 15th day of December, 2010,
> 2.    In Sweetwater County, Wyoming,
> 3.    The Defendant, Ivan Lee Sweets, Sr.,
> 4.    Did dispose of Mary Froman's crane parts with a value of $1,000.00 or more,
> 5.    Which he knew, believed or had reasonable cause to believe were obtained in violation of law.

[¶32]  The elements outlined in the jury instructions track the statutory language of each offense.  *See* Wyo. Stat. Ann. § 6-3-407 (LexisNexis 2013) (Obtaining Property by False Pretenses); Wyo. Stat. Ann. § 6-3-403 (LexisNexis 2013) (Wrongful Disposing of

Property).[2]  A comparison of those elements shows that each offense clearly contains at least one element that the other does not.  Obtaining property by false pretenses requires the showing of an intent to defraud, whereas wrongful disposing of property contains no such requirement.  *See Trevino*, ¶ 12, 142 P.3d at 218 ("Intent to defraud is an essential element of the crime of obtaining property by false pretenses[.]"); *Capshaw v. State*, 737 P.2d 740, 744 (Wyo. 1987) (statute proscribing wrongful receipt or disposing of property requires no showing of specific intent).  And, wrongful disposing of property requires a showing that the property was disposed of, whereas obtaining property by false pretenses contains no such requirement.  *See Miller v. State*, 732 P.2d 1054, 1062 (Wyo. 1987) (Crime of obtaining property by false pretenses is complete upon obtaining property from victim.).

[¶33]  Application of the same elements test illustrates that the legislature intended the crimes with which Sweets was charged and convicted to be separate offenses with separate punishments.  Moreover, we have  held that  "[w]here independent but

---

[2] Wyo. Stat. Ann. § 6-3-407 provides:

> (a)  A person who knowingly obtains property from another person by false pretenses with intent to defraud the person is guilty of:
>
> (i)  A felony punishable by imprisonment for not more than ten (10) years, a fine of not more than ten thousand dollars ($10,000.00), or both, if the value of the property is one thousand dollars ($1,000.00) or more; or
>
> (ii)  Repealed by Laws 1984, ch. 44, § 3.
>
> (iii)  A misdemeanor punishable by imprisonment for not more than six (6) months, a fine of not more than seven hundred fifty dollars ($750.00), or both, if the value of the property is less than one thousand dollars ($1,000.00).

Wyo. Stat. Ann. § 6-3-403 provides:

> (a) A person who buys, receives, conceals or disposes of property which he knows, believes or has reasonable cause to believe was obtained in violation of law is guilty of:
>
> (i)  A felony punishable by imprisonment for not more than ten (10) years, a fine of not more than ten thousand dollars ($10,000.00), or both, if the value of the property is one thousand dollars ($1,000.00) or more; or
>
> (ii) Repealed by Laws 1984, ch. 44, § 3.
>
> (iii) A misdemeanor punishable by imprisonment for not more than six (6) months, a fine of not more than seven hundred fifty dollars ($750.00), or both, if the value of the property is less than one thousand dollars ($1,000.00).
>
> (b) A person may be indicted under this section in the county where he received or possessed the property, notwithstanding the wrongful taking occurred in another county.

overlapping statutes are directed to separate evils, cumulative punishments are intended."
*James*, ¶ 14, 271 P.3d at 1019 (citing *Nowack v. State*, 774 P.2d 561, 567 (Wyo. 1989)).
With respect to the crime of obtaining property by false pretenses we have observed that
"the gravamen of the offense is in making the false pretense, and obtaining thereby a
person's property or signature and does not depend upon ultimate loss to the victim[.]"
*Anderson v. State*, 196 P. 1047, 1051 (Wyo. 1921) (citation omitted). The offense of
wrongful disposing of property, on the other hand, is by its plain terms aimed at the evil
of what happens to the property after it is wrongfully obtained. As we explained in
*Garcia v. State*, 777 P.2d 1091 (Wyo. 1989), the evil the legislature sought to address in
the wrongful concealing or disposing of property statute does not shield the actual thief
from its coverage:

> He attempts to shore up this obvious weakness in his
> argument by contending that the possessory offenses of
> receiving and concealing were intended by the legislature to
> reach only a thief's accessories after the fact. He cites no
> cogent authority in support of this position, however, and
> ignores past decisions of this court suggesting a contrary
> conclusion. Where evidence strongly indicated the
> defendant's involvement in the underlying theft, we upheld
> his conviction for receiving and concealing stolen oil field
> drill bits based on his unexplained possession of those bits.
> *Tageant v. State*, 673 P.2d 651 (Wyo. 1983); see also
> *Capshaw v. State*, 737 P.2d 740 (Wyo. 1987). Furthermore,
> we expressly rejected the argument that an admitted thief
> could not be charged and convicted of concealing the stolen
> property in *Pote v. State*, 695 P.2d 617, 622 (Wyo. 1985). If
> we were to adopt appellant's argument, the State would be
> required to offer evidence that someone other than the
> possessor of stolen goods committed the actual theft. This
> court has repeatedly rejected such a requirement. See
> generally *State v. Callaway*, 72 Wyo. 509, 267 P.2d 970
> (1954); *Curran v. State*, 12 Wyo. 553, 76 P. 577 (1904).
> Appellant fails to consider that the evil which the legislature
> intended to address in this instance may just as well have
> been the mere wrongful possession and use of stolen
> property. The evil character of such possessory acts does not
> disappear when an unproved thief engages in such acts only
> to magically reappear when a fence or some other third party
> engages in similar conduct. Where the thief can be proven to
> have committed the lesser offense, we will not permit him to
> obstruct prosecution by giving partial proof of greater guilt.

14

> Appellant was properly charged and prosecuted for concealing stolen property.

*Garcia*, 777 P.2d at 1094.

[¶34] Application of the *Blockburger* same elements test reveals a legislative intent to make obtaining property by false pretenses and wrongful disposing of property separate criminal offenses and to impose separate punishments for violation of those offenses. Under the same elements analysis, Sweets' multiple punishments did not violate double jeopardy protections and his convictions were not required to merge for sentencing.

**3.     Application of Facts or Evidence Test**

[¶35] As discussed above, our facts or evidence test focuses not on the statutory elements of the charged offenses, but on the facts proved at trial and "whether those facts show that in practical effect the defendant committed but a single criminal act." *Bilderback*, 13 P.3d at 255. It is on this test that Sweets relies in contending that the district court erred in denying his merger motion. Sweets argues that his acts of obtaining and disposing of the crane attachments occurred together and at once and resulted, in practical effect, in but a single criminal act. Sweets' argument has merit under our facts or evidence test. Given, however, that the same elements test reveals such a clear legislative intent to define separate offenses with separate punishments, we decline to require a merger of Sweets' sentences. Instead, we find that this case highlights the need to reconsider our facts or evidence test, which on close examination, we conclude should yield to the constitutionally-based same elements test as the sole means to analyze sentencing merger questions.

[¶36] We begin our reconsideration of the facts or evidence test by reviewing two cases in which this Court's application of the test has resulted in findings that convictions must merge for sentencing. We start our analysis here because, although both cases address offenses entirely different from the offenses with which Sweets was charged and convicted, the reasoning in the two cases illustrates how the facts or evidence test must apply to the offenses at issue in the case before us.

[¶37] In *Najera*, we required merger of a father's multiple convictions for sexual assault and incest. We reasoned:

> In this case . . . five of the six sexual assault charges (counts I and III through VI) required proof that Appellant was the father of the victims and was, therefore, in a position of authority as required by the applicable statute. The incest charges also required the State to prove that Appellant was the father of the victims. All sexual assault charges required

15

either sexual intrusion or sexual contact, and so did the incest charges. ***In short, it would be impossible for Appellant to commit second- or third-degree sexual assault based upon the use of his position of authority as father of the victims without also committing incest***. We conclude that the incest counts VII, IX, X, XI, and XII merge, for the purpose of sentencing, into the sexual assault counts I, III, IV, V, and VI, respectively.

*Najera*, ¶ 13, 214 P.3d at 994 (emphasis added).

[¶38] In *Bilderback*, we addressed merger of a defendant's convictions for attempted second degree murder and use of a firearm in the commission of a felony. Applying the same elements test, we found that no merger was required because the two offenses had different elements. *Bilderback*, 13 P.3d at 254. But, in applying the facts or evidence test, we concluded that merger was required, explaining:

> It is undisputed that Mr. Bilderback's only act which caused him to be found guilty of attempted second-degree murder was the shooting of Officer Parkin. Obviously, under the facts in this record, that shooting could not have been accomplished without the use of the firearm. The state presents a theoretical argument that not all attempted second-degree murder scenarios necessarily involve the use of a firearm, and this is certainly true. But that is not the correct analysis. We must carefully examine the facts of *this* case and determine whether *this* defendant's offenses under § 6-1-301(a)(i) and § 6–2–104 could have occurred without the defendant necessarily committing an offense under § 6-8-101(a). They could not.

*Bilderback*, 13 P.3d at 255 (emphasis in original).

[¶39] Our decisions in *Najera* and *Bilderback* illustrate that in applying the facts or evidence test, our inquiry has focused on whether the State used the same facts or evidence to prove all elements of the convicted offenses (*Najera*), or whether one of the convictions subsumes the other—that is, whether under the facts in evidence, the only way one of the offenses was committed was by commission of the other (*Bilderback*). Where the answer to either question is in the affirmative, we have required merger of the convictions for sentencing.

[¶40] Turning then to the present case, the reasoning of *Najera* and *Bilderback* requires that we consider whether either of Sweets' convictions, obtaining property by false

16

pretenses or wrongful disposing of property, was subsumed by the other or was based on the same facts. We conclude that the answer to both questions is yes.

[¶41] In arguing the facts or evidence test, Sweets focuses his attention on the wrongful disposing of property offense and asserts that the only way he could have wrongfully disposed of property under the facts proven was through his offense of obtaining property by false pretenses. That is, the wrongful disposing could not have occurred without the first offense. The State argues in response that wrongful disposing of property requires only a showing that the property was obtained in violation of law and there are any number of ways to prove that—for example, a third party could have stolen the property and given or sold it to Sweets. The State's observation is certainly true, and under the same elements test its argument would be relevant to the inquiry. Under the facts or evidence test, however, we do not consider, as we explained in *Bilderback*, the theoretically possible ways to prove the elements of the multiple offenses. The facts or evidence test instead requires that we "examine the facts of *this* case and determine whether *this* defendant's [offense under § 6-3-403 (wrongful disposing)] * * * could have occurred without the defendant necessarily committing an offense under [§ 6-3-407 (obtaining property by false pretenses)]." *See Bilderback*, 13 P.3d at 255. As in *Bilderback*, we conclude that it could not.

[¶42] In this case, the facts show that Sweets' wrongful disposing of property could not have occurred without his obtaining property by false pretenses. That is simply the way it happened in this case. Moreover, while the State certainly can prove the offense of obtaining property by false pretenses without showing that the property was then disposed of, the State in this case placed great emphasis on the fact of Sweets' wrongful disposing of the property and relied on that fact to prove his offense of obtaining property by false pretenses—more specifically, to prove his intent to defraud. In other words, the State argued to the jury: Sweets said he was moving the crane attachments for safekeeping, but instead he immediately sold the property—and that is evidence of his fraudulent intent. The State's closing argument to the jury illustrates its reliance on Sweets' actions as one fluid transaction to prove the fraudulent intent element of the obtaining property by false pretenses:

> Was there a verbal agreement? Yes, there was. What was the only verbal agreement that there was? Ivan could take some of the parts and put them at 5 Star. That was the agreement. That is not what happened. The fact that Ivan told Mary numerous things in order to make her believe that is what was going to happen and then took her property and disposed of it as he saw fit is where the intent to defraud is.
> . . .
>
> . . . .

17

> In my mind I compare this case to a case where you have a vehicle that you take for a test drive. You take a vehicle for a test drive, that you are supposed to bring it back. You are supposed to take care of it. You might be buying that vehicle and the car company that you pick it up from thinks they are going to let you borrow it so that you can buy that, do you have permission to go down to Pacific Steel and scrap it for $100? No, you do not. If the deal is you are going to bring it back and you are going to keep it safe, you don't get to scrap the car.

[¶43] As a practical matter, the facts in this case show that Sweets engaged in and was convicted of a single criminal transaction—he scrapped property that was entrusted to him for safekeeping. Under these circumstances, the facts or evidence test instructs that Sweets' convictions should merge for sentencing. We are troubled by this prospect, however, because our application of the same elements test reveals a clear legislative intent to separately punish the crimes of obtaining property by false pretenses and wrongful disposing of property, and under the United States Supreme Court prescribed double jeopardy analysis, legislative intent is the controlling determinant in evaluating the constitutionality of multiple punishments.

> Focusing double jeopardy analysis on multiple punishment concerns leads inexorably to deference to legislative intent. The appropriate punishment for criminal conduct is whatever the legislature determines. Any interpretation of double jeopardy protection that did not give determinative weight to legislative intent would necessarily and improperly act as a substantive limitation on the power of the legislature to define crime and punishment.

Poulin, *supra*, 77 U. Colo.L.Rev. at 606 (footnotes omitted); *see also Garrett v. United States*, 471 U.S. 773, 779, 105 S.Ct. 2407, 2411, 85 L.Ed. 764 (1985) (no double jeopardy bar to legislature punishing separately each step leading to consummation of transaction and also punishing the completed transaction); *Hunter*, 459 U.S. at 368, 103 S.Ct. at 679 ("Legislatures, not courts, prescribe the scope of punishments," and double jeopardy does not preclude legislature from authorizing cumulative punishments under two statutes for the same conduct.); *Brown*, 432 U.S. at 165, 97 S.Ct. at 2225 ("[T]he Fifth Amendment double jeopardy guarantee serves principally as a restraint on courts and prosecutors. The legislature remains free under the Double Jeopardy Clause to define crimes and fix punishments[.]"); *Albrecht v. United States*, 273 U.S. 1, 11, 47 S.Ct. 250, 254, 71 L.Ed. 505 (1927) (recognizing legislative branch power to punish separate steps in a criminal transaction).

[¶44] The divergent results in this case between application of the same elements test and the facts or evidence test bring to the forefront the ambiguity that the facts or evidence test has injected into our merger analysis. We recognize the need to address that ambiguity, but we are also mindful that this Court must approach the prospect of overruling prior case law with great caution:

> We consider the doctrine of *stare decisis* to be an important principle which furthers the "evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Cook v. State*, 841 P.2d 1345, 1353 (Wyo. 1992) (quoting *Payne v. Tennessee*, 501 U.S. 808, 827, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720 (1991)).
>
> Nevertheless, we should be willing to depart from precedent when it is necessary "to vindicate plain, obvious principles of law and remedy continued injustice." *Id.* When precedential decisions are no longer workable, or are poorly reasoned, we should not feel compelled to follow precedent. Stare decisis is a policy doctrine and should not require automatic conformance to past decisions

*Brown v. City of Casper*, 2011 WY 35, ¶ 43, 248 P.3d 1136, 1146 (Wyo. 2011) (quoting *State ex rel. Workers' Compensation Div. v. Barker*, 978 P.2d 1156, 1161 (Wyo. 1999)).

[¶45] Giving due respect to the important role of *stare decisis*, we nonetheless conclude, based on the need to align our merger analysis with the principles of double jeopardy law dictated by the United States Supreme Court, that this Court must overrule the facts or evidence test for evaluating double jeopardy challenges to multiple punishments. In addition to our discussion above, other considerations have informed our decision that the time has come to retool our sentencing merger analysis.

[¶46] First, the United States Supreme Court has expressly rejected the same facts or evidence test as unworkable and contrary to longstanding interpretation of the Fifth Amendment's double jeopardy protections. The Supreme Court's repudiation of the test came after that court itself deviated from strict application of the *Blockburger* same elements test for evaluating double jeopardy claims and adopted a "same conduct" test, which mirrors the same facts or evidence test. *See Grady v. Corbin*, 495 U.S. 508, 510, 110 S.Ct. 2084, 2087, 109 L.Ed. 2d 548 (1990). Just three years after adopting the same conduct test, the Supreme Court overruled itself, characterizing the same conduct test as lacking a constitutional basis and as unstable in its application. *United States v. Dixon*,

509 U.S. 688, 704-09, 113 S.Ct. 2849, 2860-63, 125 L.Ed. 2d 556 (1993). The Court stated, in part:

> We have concluded, however, that *Grady* must be overruled. Unlike *Blockburger* analysis, whose definition of what prevents two crimes from being the "same offence," U.S. Const., Amdt. 5, has deep historical roots and has been accepted in numerous precedents of this Court, *Grady* lacks constitutional roots. The "same-conduct" rule it announced is wholly inconsistent with earlier Supreme Court precedent and with the clear common-law understanding of double jeopardy. See, *e.g., Gavieres v. United States*, 220 U.S., at 345, 31 S.Ct., at 416 (in subsequent prosecution, "[w]hile it is true that the conduct of the accused was one and the same, two offenses resulted, each of which had an element not embraced in the other" ). . . .
>
> . . . .
>
> Having encountered today yet another situation in which the pre-*Grady* understanding of the Double Jeopardy Clause allows a second trial, though the "same-conduct" test would not, we think it time to acknowledge what is now, three years after *Grady,* compellingly clear: the case was a mistake. We do not lightly reconsider a precedent, but, because *Grady* contradicted an "unbroken line of decisions," contained "less than accurate" historical analysis, and has produced "confusion," we do so here.

*Dixon*, 509 U.S. at 704, 711, 113 S.Ct. at 2860, 2864 (footnote and citations omitted).

[¶47] We also observe that our own Court, in evaluating double jeopardy claims, has emphasized that the protection relates to "offenses," as defined by statutory elements and not as defined by a defendant's particular actions. *See Granzer v. State*, 2010 WY 130, ¶ 16, 239 P.3d 640, 646 (Wyo. 2010) (The focus of the *Blockburger* test is not on the similarity of the evidence relied on to prove the elements of the offenses but on the elements themselves.); *Cook v. State*, 841 P.2d 1345, 1347 (Wyo. 1992) (quoting Black's Law Dictionary 1081 (6th ed. 1990)) ("As used in the Double Jeopardy Clause, 'same offense' means 'the same crime, not the same transaction, acts, circumstances, or situation.'"). Even after adopting the facts or evidence test[3], this Court expressed a

---

[3] It appears that this Court first applied the facts or evidence in 1992 in *Rivera*, 840 P.2d at 944 ("In deciding merger questions, we focus not only on the similarity of the elements of the crimes, but also, and

20

continued adherence to and even preference for the statutory elements test for reviewing double jeopardy claims related to multiple punishments:

> The *Blockburger* test is the one chosen to determine if offenses have identical statutory elements or if the elements of an offense are identical to some of the elements of a greater offense in reaching a conclusion as to whether it is a lesser included offense. *Dixon.*

> It is clear that the *Blockburger* analysis parallels the statutory elements test for lesser included offenses. The application of the *Blockburger* test has nothing to do with the evidence presented at trial. *Corbin.* As *Blockburger* is traced through *Corbin, Felix,* and *Dixon,* it is clear that its role is to bar a subsequent prosecution if one of the two offenses is a lesser included offense of the other. That determination is made solely upon a comparison of the statutory elements.

> Logically, the protection accorded by the double jeopardy clause with respect to multiple punishments should be based upon the same test. The double jeopardy clause prevents a "sentencing court from prescribing greater punishment than the legislature intended." *Missouri v. Hunter*, 459 U.S. 359, 366, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983). The cumulative punishment analysis must be made in the light of the dichotomy in the approach of the Supreme Court of the United States. Historical review of the origin of the *Blockburger* test discloses that its use for multiple prosecution and cumulative punishment is consistent.

> . . . .

> We are satisfied the statutory elements analysis should be used as the foundation for double jeopardy protection in connection with both multiple prosecutions and multiple or cumulative punishments. Once the offense is classed as a lesser included offense, then a multiple prosecution or a multiple punishment is foreclosed. A more broadly-stated test than the statutory elements analysis for arriving at lesser included offenses such as the inherent

---

primarily, on the facts proved at trial, for the question is whether those facts show that in practical effect the defendant committed but a single criminal act.").

> relationship standard simply invites frequent questions concerning double jeopardy violations, especially for cumulative punishment. This result should be avoided.

*State v. Keffer*, 860 P.2d 1118, 1130-31 (Wyo. 1993).

[¶48]  In a recent decision, we expressed our recognition that federal law is firmly grounded in its reliance on the same elements test for double jeopardy analysis, and we cited our own continuing allegiance to that approach:

> Federal double jeopardy law appears to have been settled in *United States v. Dixon*, 509 U.S. 688, 696, 113 S.Ct. 2849, 2856, 125 L.Ed.2d 556 (1993), with the Supreme Court's holding that "[i]n both the multiple punishment and multiple prosecution contexts, this Court has concluded that where the two offenses for which the defendant is punished or tried cannot survive the 'same-elements' test, the double jeopardy bar applies." The inquiry under the same-elements test is "whether each offense contains an element not contained in the other; if not, they are the 'same offence' and double jeopardy bars additional punishment and successive prosecution." *Id*.  Like the United States Supreme Court, this Court recognizes and follows the same-elements test. *See, e.g., Granzer v. State*, 2010 WY 130, ¶ 13, 239 P.3d 640, 645 (Wyo. 2010); *Snow v. State*, 2009 WY 117, ¶ 16, 216 P.3d 505, 510 (Wyo. 2009); and *Najera v. State*, 2009 WY 105, ¶ 11, 214 P.3d 990, 994 (Wyo. 2009).

*Rathbun v. State*, 2011 WY 116, ¶ 6, 257 P.3d 29, 32 (Wyo. 2011).

[¶49]  The case before us illustrates that application of the same facts or evidence test will not always yield results that are consistent with the same elements test.  Because the same elements test is the test both mandated by the United States Supreme Court and historically relied on by this Court, and to align our double jeopardy analysis with federal precedent and our own precedent, we hereby overrule the same facts or evidence test. The same elements test shall henceforth serve as our sole test for evaluating sentencing merger questions.[4]

---

[4]  Given the Court's decision, the term "merger of sentences" has little utility in our jurisprudence.  In the rare instance that two criminal statutes are found to contain the same elements, the convictions under those statutes would merge for the purpose of sentencing.  If one crime carries a greater penalty than the other, that would be the penalty applied.  In the event of such a merger, the convictions would also merge and the defendant in question would then carry only a single conviction forward in his or her record.

## CONCLUSION

[¶50] Sweets' conviction and sentence are affirmed. To the extent our past decisions have applied the facts or evidence test to evaluate sentencing merger, those decisions are overruled. *See, e.g., James*, ¶ 13, 271 P.3d at 1019; *Winstead*, ¶ 14, 261 P.3d at 746; *Najera*, ¶ 11, 214 P.3d at 994; *Bilderback,* 13 P.3d at 254; *Rouse*, 966 P.2d at 970; *Owen*, 902 P.2d at 193; *Rivera*, 840 P.2d at 944. The same elements test is now the controlling inquiry for evaluating questions of sentencing merger.